BRIAN M. BOYNTON, Principal Deputy Assistant Attorney General
ARUN G. RAO, Deputy Assistant Attorney General
AMANDA N. LISKAMM, Director
LISA K. HSIAO, Senior Deputy Director
ZACHARY A. DIETERT, Assistant Director
FRANCISCO L. UNGER, Trial Attorney (MABN 698807)
ZACHARY L. COWAN, Trial Attorney (NCBN 53432)
WESLINE N. MANUELPILLAI, Trial Attorney (DCBN 90001965)
AMBER M. CHARLES, Trial Attorney (DCBN 1035226)

U.S. Department of Justice
Civil Division
Consumer Protection Branch
450 5th Street NW, Suite 6400-S
Washington, DC 20530
Telephone: (202) 598-3855
Email: Francisco.L.Unger@usdoj.gov

ISMAIL J. RAMSEY, United States Attorney (CABN 189820)
MICHELLE LO, Chief, Civil Division (NYBN 4325163)
DAVID M. DEVITO, Assistant United States Attorney (CABN 243695)

Northern District of California
450 Golden Gate Avenue
San Francisco, California 94102
Telephone: (415) 436-7200
Email: David.Devito@usdoj.gov

*Attorneys for Plaintiff United States of America*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ADOBE INC., a corporation,<br>MANINDER SAWHNEY, individually, and<br>DAVID WADHWANI, individually,<br><br>Defendants. | Case No. _____<br><br>**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff, the United States of America ("the United States"), acting upon notification and referral from the Federal Trade Commission ("FTC"), for its Complaint alleges:

## NATURE OF THE CASE

1.       Adobe Inc. ("Adobe") is one of the world's largest software companies, known for developing popular design and productivity software applications, such as Acrobat, Photoshop, and Illustrator. Adobe offers subscription plans to these and dozens of other products and services on its website, *Adobe.com*.

2.       For years, Adobe has harmed consumers by enrolling them in its default, most lucrative subscription plan without clearly disclosing important plan terms. Adobe fails to adequately disclose to consumers that by signing up for the "Annual, Paid Monthly" subscription plan ("APM plan"), they are agreeing to a year-long commitment and a hefty early termination fee ("ETF") that can amount to hundreds of dollars. Adobe clearly discloses the ETF only when subscribers attempt to cancel, turning the stealth ETF into a powerful retention tool that ███████████████████ by trapping consumers in subscriptions they no longer want.

3.       During enrollment, Adobe hides material terms of its APM plan in fine print and behind optional textboxes and hyperlinks, providing disclosures that are designed to go unnoticed and that most consumers never see. Adobe then deters cancellations by employing an onerous and complicated cancellation process. As part of this convoluted process, Adobe ambushes subscribers with the previously obscured ETF when they attempt to cancel. Through these practices, Adobe has violated federal laws designed to protect consumers.

4.       ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

5.       ████████████████████████████████████████████████████████████████████████████████████

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF

1 ██████████████████████████████████████████████

2 ██████████████████████████████████████████████

3 ██████████████████████████████████████████████

4 ██████████████████████████████████████████████

5 ██████████████████████████████████████████████

6 ██

7   6.   To put an end to Adobe's unlawful conduct, the United States brings this lawsuit, seeking

8 injunctive relief, civil penalties, equitable monetary relief, as well as other relief.

9                    **JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT**

10   7.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345,

11 and 1355, as well as 15 U.S.C. §§ 45(m)(1)(A), 53(b), and 56(a), because this case involves claims arising

12 under federal laws regulating commerce and is commenced by the United States.

13   8.   Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(2), (d), and

14 1395(a), as well as 15 U.S.C. § 53(b), because Defendants transact business in this District and a

15 substantial part of the events or omissions giving rise to the claims occurred in this District.

16   9.   Divisional assignment to the San Jose Division is proper under Civil Local Rule 3-2(e)

17 because Adobe has its principal place of business in San Jose and because a substantial part of the events

18 or omissions giving rise to the claims occurred there.

19                                   **PLAINTIFF**

20   10.   The United States brings this action under Sections 5(a), 5(m)(1)(A), 13(b), 16(a), and 19,

21 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), 56(a), and

22 57b, as well as Section 5 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8404,

23 which authorize the United States to seek, and this Court to order, permanent injunctive relief, rescission

24 or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, or

25 other equitable relief, in addition to civil penalties, for Defendants' violations of the FTC Act, 15 U.S.C.

26 § 45(a), and ROSCA, 15 U.S.C. § 8403.

27

28

**DEFENDANTS**

**A.    Adobe**

11.    Defendant Adobe is a Delaware corporation with its principal place of business at 345 Park Avenue, San Jose, California 95110. Adobe transacts and has transacted business in this District and throughout the United States.

12.    At all times relevant to this Complaint, acting alone or in concert with others, Adobe has advertised, marketed, distributed, or sold subscriptions to its software products and services to consumers throughout the United States. Adobe has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**B.    Maninder Sawhney**

13.    Defendant Maninder Sawhney ("Sawhney") is the Senior Vice President of Digital Go To Market & Sales at Adobe, a position he has held since December 2018. At times relevant to this Complaint, acting alone or in concert with others, Sawhney formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Adobe, including acts and practices set forth in this Complaint.

14.    ██████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████

15.    Sawhney, in connection with the matters alleged in this Complaint, transacts or has transacted business in this District and throughout the United States.

**C.    David Wadhwani**

16.    Defendant David Wadhwani ("Wadhwani") is the President of Digital Media Business at Adobe and reports directly to Adobe's Chief Executive Officer ("CEO"). At times relevant to this Complaint, acting alone or in concert with others, Wadhwani formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Adobe, including acts and practices set

4

1  forth in this Complaint.

2  17. ███████████████████████████████████████████████████

3  ███████████████████████████████████████████████████████████

4  ███████████████████████████████████████████████████████████

5  ███████████████████████████████████████████████████████████

6  ███████████████████████████████████████████████████████████

7  ███████████████████████████████████████████████████████████

8  ███████████████████████████████████████████████████████████

9  ████████████████████████████████████████████

10  18.     Wadhwani, in connection with the matters alleged in this Complaint, transacts or has

11  transacted business in this District and throughout the United States.

12  **THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT**

13  19.     ROSCA, 15 U.S.C. § 8401 *et seq*., recognizes that "[c]onsumer confidence is essential to

14  the growth of online commerce," and that "[t]o continue its development as a marketplace, the Internet

15  must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete

16  with one another for consumers' business." *Id.* § 8401.

17  20.     Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods

18  or services sold in transactions effected on the Internet through a "negative option feature" unless the

19  seller: (a) clearly and conspicuously discloses all material terms of the transaction before obtaining the

20  consumer's billing information; (b) obtains the consumer's express informed consent before making the

21  charge; and (c) provides simple mechanisms to stop recurring charges. *See id.* § 8403.

22  21.     A "negative option feature" is defined as: "in an offer or agreement to sell or provide any

23  goods or services, a provision under which the consumer's silence or failure to take an affirmative action

24  to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the

25  offer." 16 C.F.R. § 310.2(w); *see* 15 U.S.C. § 8403.

26  22.     Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404(a), and Section 18(d)(3) of the FTC

27  Act, *id.* § 57a(d)(3), a violation of ROSCA constitutes a violation of an FTC rule under Section 18 of the

28

FTC Act, *id*. § 57a, and constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, *id.* § 45(a).

**DEFENDANTS' UNLAWFUL ACTIVITIES**

**I.   Adobe's Subscription-Based Business Model**

23.    Prior to 2012, Adobe typically sold its software to consumers under a perpetual licensing model, where the consumer paid for the product once and could use it indefinitely.

24.    In or around 2012, Adobe began shifting to a subscription-based licensing model, where consumers must pay for monthly or yearly access to Adobe's products, and where their subscription renews automatically. Under this model, Adobe earns more revenue the longer a consumer remains subscribed. Adobe's shift to the subscription model has significantly increased its recurring revenues.

25.    Adobe's subscription offerings include a wide array of software products and services for content design, publication, and cloud storage, including its flagship applications Acrobat, Photoshop, Illustrator, and Creative Cloud. Adobe has sold these subscriptions to a wide range of consumers on its website, *Adobe.com*, as part of Adobe's Digital Media business unit.

26.    Adobe's subscription revenue has nearly doubled in recent years. In 2019, Adobe earned $7.71 billion in subscription-based revenue. By 2023, subscription-based revenue accounted for $14.22 billion of Adobe's $19.41 billion in total annual revenue.

27.    Adobe offers three types of subscription plans to consumers: (1) "Monthly," (2) "Annual Paid Monthly" ("APM"), and (3) "Annual Prepaid."

28.    The APM plan is sometimes referred to by Adobe as "Yearly, billed monthly" or ███ ████████████████████████████████████████████████████████

29.    Adobe frequently pre-selects the APM plan as a default selection in subscription enrollment flows.

30.    ███████████████████████████████████████ Since at least 2019, the APM plan has included the following material terms, among others:

  a.    subscribers are automatically charged each month until they affirmatively cancel;

  b.    cancellation before the end of the year is subject to an ETF;

  c.    Adobe calculates the ETF amount as 50 percent of the "remaining contract

obligation,"—i.e., the customer will be "charged a lump sum amount" of 50 percent of the total monthly charges for the months remaining in the yearly contract;

    d.    subscribers who cancel before the end of the first year lose service at the end of the monthly billing period during which they cancel; and,

    e.    subscribers cancelling within 14 days of their first payment are entitled to a full refund.

31.    Adobe's subscription-based model incentivizes it to, on the front end, lock consumers into longer-term subscriptions like the APM plan, and, on the back end, discourage cancellation.

**II.**    **Adobe's Unlawful Subscription Enrollment Practices**

32.    Consumers subscribe to Adobe products by using a computer or smart device to take one of multiple paths to begin the enrollment process, each of which is also known as an enrollment "flow." For example, consumers can go to *Adobe.com* and navigate to the page of the product to which they want to subscribe.

33.    For many products and services, Adobe offers free trials in addition to no-trial (or "buy now") subscriptions. Adobe automatically converts consumers who select the APM plan during a free trial enrollment to paid subscribers if they do not cancel their subscriptions before the trial period ends. Consumers who start with a "buy now" APM subscription, rather than a free trial, encounter substantially the same enrollment flow, except the "buy now" subscription flows do not contain text relating to a free trial.

34.    Regardless of the specific enrollment flow consumers encounter when they sign up, the segment or product they select, and whether they receive a free trial, consumers who have subscribed to an APM plan ███████████ have generally followed substantially the same enrollment flow provided in the example below, except that the enrollment flow many consumers have encountered, particularly prior to October 2021, does not include the initial plan selection page. Adobe's enrollment flows fail to clearly and conspicuously disclose material terms of the APM plan, including (1) that the length of the subscription term is one year, (2) that cancellation before the end of the first year is subject to an ETF, and (3) the amount of the ETF.

**A.  Adobe's Unlawful Enrollment Flows**

35.   Paragraphs 36 to 52 provide an example of an illustrative enrollment flow for consumers enrolling in a free trial for an APM plan. In this example flow, consumers who select a "Free trial" button for a product are directed to additional pages, including pages for: (1) plan selection, (2) email entry, and (3) payment entry.

**1.  Plan Selection Page**

36.   Adobe's enrollment flows often begin with a plan selection page that presents available subscriptions and their prices, like the one illustrated below.

**Enrollment Flow Example 1:** Plan Selection Page In Creative Cloud Free Trial Flow, May 2023



37.   The element of each plan that Adobe displays most prominently is a price, with the APM plan showing the lowest dollar amount. Adobe frequently also pre-selects the APM plan as a default.

38.   In Enrollment Flow Example 1, the bottom of each plan selection box includes a less prominent line of text, followed by a "tooltip" icon: ⓘ. In particular, the APM plan box states: "*Fee applies if you cancel after 14 days.* ⓘ."

39.     Consumers navigating the enrollment flow do not see the additional text contained in the tooltip (i.e., a small pop-up text box), which is in an even less prominent font, unless they hover over or click the ⓘ icon. Customers using a touchscreen device (e.g., a phone or tablet) must tap the ⓘ icon to view the tooltip. Consumers who access the ⓘ icon for the APM plan in this example flow reveal a tooltip that reads: "If you cancel after 14 days, your service will continue until the end of that month's billing period, and you will be charged an early termination fee."

**Enrollment Flow Example 2:** APM Plan Tooltip In Creative Cloud Free Trial Flow, May 2023



40.     Enrollment Flow Example 2 is a zoomed-in version of the plan selection list featured on Adobe's plan selection page. In this example, the tooltip icon is being engaged with (i.e., hovered over or clicked), revealing the informational text it displays.

41.     As Enrollment Flow Example 2 shows, a consumer who accessed the information contained behind the tooltip is still not given concrete information about the amount of the ETF, how it is calculated, or the subscription term, if any, to which it applies.

42.     As Enrollment Flow Examples 1 and 2 show, the plan selection page does not state anywhere that the APM plan requires a one-year commitment. Consumers who do not access the ⓘ icon

1  are not informed that the "fee" mentioned in the APM box in less prominent text is an ETF.

2      43.    Moreover, the plan selection page, even in the text accessible only through the tooltip, does

3  not clearly explain what constitutes "early termination," *i.e.*, that cancelling before paying for a full year

4  of service will result in a fee.

5      44.    Finally, the plan selection page does not disclose *at all* the amount of the fee that consumers

6  would be charged for early cancellation.

7      45.    Adobe often presents consumers with a plan selection page similar to the one described

8  above. However, for certain consumers—████████████████████████████████████████████

9  ████████████—Adobe has not included a plan selection page at any point. In these enrollment flows,

10  consumers do not even see other subscription plan options and do not have an opportunity to view the

11  tooltip text.

12          **2.     Email Entry Page**

13      46.    Whether consumers encounter a plan selection page, or Adobe pre-selects the APM Plan

14  and omits a plan selection page as set forth in Paragraph 45, Adobe then directs consumers to additional

15  pages, often including one that requires consumers to provide an email address. Nothing on this page

16  mentions an annual commitment, an ETF, or a fee amount.

17          **3.     Payment Entry Page**

18      47.    The final enrollment page is often a payment entry page (an example of which is shown

19  below), where Adobe requires consumers to enter their payment information to enroll.

20      <u>**Enrollment Flow Example 3:**</u> Payment Page In Creative Cloud Free Trial Flow, May 2023



48.     Enrollment Flow Example 3 provides an example of the page in Adobe's enrollment flows that directs consumers to enter their payment information. The page also provides information about the APM plan's terms, but in small inconspicuous font beneath that entry form, which Adobe knows many consumers do not notice or read. In the example above, that text states:

> By clicking "Agree and subscribe", you agree: **After your trial ends, you will be charged US$[subscription price] (plus tax) monthly. At the end of your one-year term, your subscription will automatically renew monthly until you cancel (price subject to change). Cancel before your trial ends and you won't be charged. No annual commitment required after the first year. Cancel anytime via Adobe Account or Customer Support**. Cancel before [date] to get a full refund and avoid a fee. You also agree to the Terms of Use and the Subscription and Cancellation Terms.

49.     This fine print paragraph includes the *first and only* mention across the entire flow of an "annual commitment." Even here the commitment is not explicitly linked to any ETF or other charge. The reference to cancelling to "avoid a fee" does not mention the ETF by name or state its amount.

50.     In Enrollment Flow Example 3, the blue text labeled "Subscription and Cancellation Terms" is a hyperlink that consumers may click on to reveal a pop-up window with additional terms. Consumers can enroll in subscriptions without clicking that link, and Adobe knows most consumers do not click it before enrolling in an APM plan.

51.     Even if a consumer clicked on the "Subscription and Cancellation Terms" hyperlink, they would then have to scroll to the bottom of the pop-up window (through multiple screens of text if on a mobile device) to find cancellation terms, which in this example enrollment flow state:

> You can cancel your subscription anytime via your Adobe Account page or by contacting Customer Support*. If you cancel within 14 days of your initial order, you'll be fully refunded. Should you cancel after 14 days, you'll be charged a lump sum amount of 50% of your remaining contract obligation and your service will continue until the end of that month's billing period.

52.     This description, if a consumer were to find it, does not include the word "fee" or phrase "Early Termination Fee," and thus does not match earlier references to a "fee" for cancellation. Nor does this text clarify the length of the subscription term or what it means by "your remaining contract obligation."

53.     ███████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████.

**B.   Defendants Know About and Profit from Consumer Confusion Regarding the APM Plan**

54.   Adobe's enrollment practices have generated frequent complaints from subscribers of the APM plan, including to the Better Business Bureau ("BBB"), ███████████████████████, on social media, on Adobe's community support web pages, and to ████████.

55.   In their complaints, consumers have reported they did not understand what they were signing up for and were surprised to learn they were enrolled in a plan that requires a one-year commitment or that imposes a hefty ETF. ████████████████████████████ ██████████████████████████████████████████████

56.   Defendants know about and have monitored numerous complaints received directly from consumers and from other sources like the BBB, and they know that consumers are often confused about or misunderstand the terms of the APM plan, including its one-year commitment and ETF.

57.   ██████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ███████████████████████████████████████

58.   ██████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████

III.   **Sawhney's Supervision of, and Participation in, Adobe's Unlawful Enrollment Practices**

59. 

60. 

61. 

62. 

63. 

64. 

65. 

66. 

67.

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████

**IV.     Wadhwani's Supervision of, and Participation in, Adobe's Unlawful Enrollment Practices**

68.     David Wadhwani is Adobe's President of Digital Media Business. In this role, he reports directly to Adobe's CEO, Shantanu Narayen, and helps guide Adobe's overall business strategy regarding online subscriptions, including the APM plan.

69.     Wadhwani was previously a Senior Vice President of the Digital Media Business. He has worked in a leadership role within the Digital Media Business for more than a decade.

70.     Wadhwani was one of the chief architects behind Adobe's pivot from its legacy product offerings to its current digital subscription model based on maximizing recurring revenues.

71.     ██████████████████████████████████

██████████████████████████████

72.     ██████████████████████████████████

████████████████████████

73.     ██████████████████████████████████

██████████████████████████████████████

74.     ██████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████

75.     ██████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF

**V.      Adobe's Unlawful Cancellation Practices**

76.      Adobe auto-renews its customers' subscription plans and continues to charge customers until they affirmatively act to cancel their subscriptions.

77.      Adobe generally provides subscribers with two primary options to cancel a subscription: (1) online self-cancellation; and (2) contacting customer service via online chat or phone. ██████ ███████████████████████████████

78.      As set forth below, ███████████████████████████████████████████, neither cancellation method provided consumers with a simple way to cancel their subscriptions.

**A.      Self-Cancellation Flow on *Adobe.com***

79.      Most Adobe customers have the option to self-cancel their subscriptions online.

80.      ████████████████████████████████████████████████████████████████████████████████████████, to cancel on *Adobe.com*, consumers have generally had to navigate numerous pages with multiple options, much of which is wholly unnecessary to honor consumers' cancellations requests. ████ ██████████████████████████████████████████████████████████████

81.      To cancel, consumers must first locate the cancellation page. ██████████████ ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

82.      For example, at relevant times, consumers have had to first locate the account management page, then correctly choose a "Manage plan" hyperlink among various similar hyperlinks (e.g., "Access your services" and "Edit billing and payment"), and finally identify the "Cancel your plan" button.

83.      Locating and clicking on a "Cancel your plan" button does not result in cancellation. Instead, after users have clicked "Cancel your plan," Adobe has forced them to undergo a convoluted process requiring several additional steps, some of which were wholly unnecessary to complete cancellation.

84.     For example, at relevant times, consumers who clicked "Cancel your plan" had to reenter their Adobe password—regardless of whether the subscriber had already signed in before reaching the screen. Also, consumers have been sent to a mandatory Feedback page, requiring them to provide reasons for cancellation. This page has not informed consumers that their cancellation request was incomplete.

85.     Additionally, consumers have had to navigate through several web pages, pop-ups, and offers designed for retention. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

86.     Finally, Adobe has required consumers to review and "confirm" the multitude of consequences that would follow the cancellation. For example, at relevant times, Adobe placed in prominent red font the ETF amount that APM plan subscribers would be charged if they cancelled their subscription.

87.     ████████████████████████████████ Adobe offers no way to dispute this charge using the self-cancel flow. Subscribers have had to either pay the fee to cancel or reach out to Adobe's customer service to discuss or dispute the fee. If they chose the latter route, they could not complete self-cancellation.

88.     ████████████████████████████████████████████████████████████████████████████████████

**B.     Cancellation By Contacting Customer Service**

89.     Adobe's subscribers generally can also attempt to cancel by contacting Adobe's customer service via phone or online chat. ████████████████████████████████████████████████████████████████████████████████████████

90.     Subscribers who have attempted to cancel via customer service have encountered several obstacles that impede or delay their attempts to cancel. For example:

a.     ████████████████████████████████████████████████████
████████████████

b.      subscribers have had their calls or chats either dropped or disconnected and have had to re-explain their reason for calling when they re-connect;

c.      ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ and,

d.      subscribers have been transferred to one or more Adobe representatives during their call or chat, forcing them to encounter delays, re-explain themselves, and request cancellation multiple times.

91.     ████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████

92.     ████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
█████████████████

93.     ████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████

94.     ████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

95.     Many subscribers who insist on cancelling encounter resistance and delay from Adobe representatives, ████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████

96.     Many subscribers attempting to cancel via phone or chat have been subjected to a time-consuming and burdensome process. ████████████████████████████
████████████████████████████████████

97.   ███████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████

98.   ███████████████████████████████████████████████
███████████████████████████████████████

99.   Additionally, Adobe provides no refunds or only partial refunds to some subscribers who incur charges after an attempted, unsuccessful cancellation.

100.   In numerous instances, subscribers who have requested to cancel through Adobe's customer service believe they have successfully cancelled but continue to be charged. Some of these subscribers do not realize for months that Adobe is continuing to charge them, and only learn about the charges when they review their financial accounts.

101.   Subscribers whose cancellations do not take effect are forced to restart their attempts to cancel. Because Adobe does not offer the ability to request or obtain a refund of erroneous charges through its self-cancellation flow, such subscribers must contact customer service to stop the charges and request a refund. These subscribers again face all the difficulties described above.

**C.**   ██████████████████████████████████████████

102.   ████████████████████████████████████████████████
██████████████████████████████████████████████

103.   While Adobe obscures the ETF during enrollment, it highlights it during cancellation. Adobe's manipulative enrollment practices make the ETF an effective retention tool: since many APM plan subscribers do not know about the fee until they attempt to cancel, they are surprised and discouraged from cancelling upon learning about the fee and its amount, which can sometimes be several hundred dollars.

**D.**   **Adobe Knows Its Customers Struggle to Cancel Unwanted Subscriptions**

104.   Adobe knows about the barriers consumers face when attempting to cancel their subscriptions ████████████████████████████████████████████████
████████████

105.   ███████████████████████████████████████████████

1    ███████     Adobe knows its cancellation practices have generated numerous complaints from subscribers,

2    including to the BBB, ██████████████████████████████

3         106.    The complaints describe a range of difficulties consumers have encountered when

4    attempting to cancel an Adobe subscription. As examples:

5              a.    ████████████████████████████████████

6                    ████████████████████████████████████

7                    ████████████████████████████████████

8                    ████████████████████████████████████

9                    ████████████████████████████████████

10                   ████████████████████████████████████

11                   █████████████████████

12             b.    Another consumer stated: "I have corresponded with Adobe on the phone and via

13                   their chat support over 3 times in the last few months to try and cancel my

14                   membership. Each time I try to cancel, there is a rigorous negotiation and instead

15                   of allowing the user to cancel their account, they offer 2 months at no charge."

16             c.    As to self-cancellation, yet another consumer reported: "Adobe literally will not let

17                   me cancel my subscription. Online I'm put thru an [sic] loop to continually sign in

18                   and cannot move forward to cancel."

19         107.    ████████████████████████████████████

20    ████████████████████████████████████████████████

21    ████████████████████████████████████████████████

22    ██████████████████████████████

23         108.    ████████████████████████████████████

24    ████████████████████████████████████████████████

25    ████████████████████████████████████████████████

26    ██████████████████████████████████████████

27         109.    ████████████████████████████████████

28    ███████, including, for example, an August 2021 video case study by a company called Growth Design Inc.

titled "Adobe: The Psychology of User Offboarding," which highlights and criticizes various manipulative and otherwise complicated aspects of Adobe's self-cancel flow.

**E.** ███████████████████████████████

110. █████████████████████████████████████

███████████████████████████████

111. █████████████████████████████████████

███████████████████

112. █████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████

**VI.    Adobe's Knowledge of ROSCA**

113.    Adobe is one of the world's largest software companies. It has extensive legal resources, including in-house and outside counsel. ███████████████████████

██████████████████████████████

114.    Adobe and its executives were aware of significant government and regulatory scrutiny into its subscription enrollment and cancellation practices, including a Civil Investigative Demand the FTC issued to Adobe in June 2022 probing potential violations of ROSCA related to Adobe's APM plan disclosures and cancellation mechanisms. Adobe has nevertheless persisted in its violative practices to the present day.

115. █████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████

116. █████████████████████████████████████

█████████████████████████████████████████

████████████████████

117. █████████████████████████████████████

█████████████████████████████████████████

1 ████████████████████████████████████████████

2 ████████████████████████████████████████████

3 ████████████████████████████████████████████

4 ████████████████████████████████████

5     118.    ████████████████████████████████

6 ████████████████████████████████████████████

7 ██████████████████████████

8 **VIOLATIONS OF ROSCA**

9     119.    Defendants offer consumers negative option features as defined by ROSCA, including in

10 subscriptions for products and services including the monthly, annual paid monthly, ██████

11 ████, yearly billed monthly, ████████████, annual prepaid, ████████████, annual paid

12 upfront, and ████████████ plans.

13 **COUNT I**

14 *Against All Defendants*

15 **Failure to Clearly and Conspicuously Disclose Material Terms**

16     120.    Paragraphs 1–119 are incorporated as if set forth herein.

17     121.    In numerous instances, in connection with charging consumers for goods or services sold

18 in transactions effected on the Internet through a negative option feature, as described above, Defendants

19 have failed to clearly and conspicuously disclose all material terms of the transaction before obtaining the

20 consumer's billing information, including, for example, the subscription's billing and renewal terms, the

21 length of the subscription, what cancellation fees will apply and when, and the amount of those fees.

22     122.    Defendants' practices as set forth are violations of ROSCA, 15 U.S.C. § 8403(1), and thus

23 violations of Section 18 of the FTC Act, 15 U.S.C. § 57a, 15 U.S.C. § 8404(a), and therefore constitute

24 unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

25 **COUNT II**

26 *Against All Defendants*

27 **Failure to Obtain Express Informed Consent**

28     123.    Paragraphs 1–119 are incorporated as if set forth herein.

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF

124. In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described above, Defendants have failed to obtain the consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for the transaction.

125. Defendants' practices as set forth are violations of ROSCA, 15 U.S.C. § 8403(2), and thus violations of Section 18 of the FTC Act, 15 U.S.C. § 57a, 15 U.S.C. § 8404(a), and therefore constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT III

### *Against Adobe*

### Failure to Provide a Simple Cancellation Mechanism

126. Paragraphs 1–119 are incorporated as if set forth herein.

127. In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described above, Adobe has failed to provide simple mechanisms for a consumer to stop recurring charges for the good or service to the consumer's credit card, debit card, bank account, or other financial account.

128. Adobe's practices as set forth are violations of ROSCA, 15 U.S.C. § 8403(3), and thus violations of Section 18 of the FTC Act, 15 U.S.C. § 57a, 15 U.S.C. § 8404(a), and therefore constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

129. Defendants have engaged in these unlawful acts knowingly, with knowledge of applicable regulations and with knowledge of numerous consumer complaints.

## ONGOING CONDUCT

130. Based on the facts and violations of law alleged in this Complaint, the United States and the FTC have reason to believe that Defendants are violating or are about to violate laws enforced by the FTC, including for reasons set forth below.

131. First, Defendants have a long history of continuous conduct of the type described above.

132. Second, Defendants have continued to employ at least some of their unlawful practices even after learning in 2022 about the FTC's investigation into possible ROSCA violations relating to inadequate disclosures and complex cancellation mechanisms.

133. Third, Defendants have repeatedly decided against rectifying some of Adobe's unlawful practices because of the revenue implications.

134. ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████

## CONSUMER INJURY

135. Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of ROSCA and the FTC Act. Absent injunctive relief by this Court, Adobe is likely to continue to injure consumers and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

136. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt violations of any provision of law enforced by the FTC, including ROSCA.

137. Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 5 of ROSCA, 15 U.S.C. § 8404, authorizes the Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of ROSCA, including the rescission or reformation of contracts, restitution, the refund of monies paid, and disgorgement of ill-gotten monies.

138. Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), as modified by Section 4 of the Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, and Section 1.98(c) of the FTC's Rules of Practice, 16 C.F.R. § 1.98(c), authorizes this Court to award monetary civil penalties for each violation of ROSCA committed with actual knowledge or knowledge fairly implied.

139. Defendants violated ROSCA with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

140. Each instance in which Defendants have failed to comply with ROSCA constitutes a separate violation for the purpose of assessing monetary civil penalties.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court:

A.      Enter judgment against Defendants and in favor of the United States for violations of ROSCA as alleged in this Complaint;

B.      Impose monetary civil penalties on Defendants for each violation of ROSCA;

C.      Enter a permanent injunction to prevent future violations of ROSCA by Defendants;

D.      Award monetary and other relief within the Court's power to grant; and

E.      Award any additional relief as the Court determines to be just and proper.

**DEMAND FOR JURY TRIAL**

The United States hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: June 17, 2024                         Respectfully submitted,

*Of Counsel:*                                FOR THE UNITED STATES OF AMERICA:

SANA CHAUDHRY                                BRIAN M. BOYNTON
DANIEL WILKES                                Principal Deputy Assistant Attorney General
Attorneys                                    Civil Division
Federal Trade Commission
600 Pennsylvania Avenue, N.W.                ARUN G. RAO
Washington, D.C. 20580                       Deputy Assistant Attorney General
Tel: (202) 326-2679 (Chaudhry)
Tel: (202) 326-3679 (Wilkes)                 AMANDA N. LISKAMM
SChaudhry@ftc.gov                            Director
DWilkes@ftc.gov                              Consumer Protection Branch

                                             LISA K. HSIAO
                                             Senior Deputy Director

                                             ZACHARY A. DIETERT
                                             Assistant Director

                                             */s/ Francisco L. Unger*
                                             FRANCISCO L. UNGER
                                             ZACHARY L. COWAN
                                             WESLINE N. MANUELPILLAI
                                             AMBER M. CHARLES
                                             Trial Attorneys
                                             Consumer Protection Branch
                                             U.S. Department of Justice
                                             450 5th Street, N.W. Suite 6400-S
                                             Washington, D.C. 20530
                                             (202) 598-3855 (Unger)
                                             Francisco.L.Unger@usdoj.gov

                                             ISMAIL J. RAMSEY
                                             United States Attorney

                                             DAVID M. DEVITO
                                             Assistant United States Attorney
                                             Northern District of California

1

**CERTIFICATE OF SERVICE**

2
      I HEREBY CERTIFY that I caused to be served by certified mail the foregoing document on

3
June 17, 2024 on the following parties:

4
            Adobe, Inc.                          Maninder Sawhney

5
            c/o Corporation Service Company        1269 Glen Eyrie Avenue
            251 Little Falls Drive                 San Jose, CA 95125

6
            Wilmington, DE 19808

7
            Kristin Graham Koehler             David Wadhwani
            Sidley Austin LLP                   2646 Union Street

8
            1501 K Street NW                  San Francisco, CA 94123
            Washington, DC 20005

9
            *Counsel for Adobe, Inc.*

10

11
                                      */s/ Francisco L. Unger*
                                   Francisco L. Unger

12
                                   Trial Attorney

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF