BRIAN M. BOYNTON, Principal Deputy Assistant Attorney General
ARUN G. RAO, Deputy Assistant Attorney General
AMANDA N. LISKAMM, Director
LISA K. HSIAO, Senior Deputy Director
ZACHARY A. DIETERT, Assistant Director
FRANCISCO L. UNGER, Trial Attorney (MABN 698807)
ZACHARY L. COWAN, Trial Attorney (NCBN 53432)
WESLINE N. MANUELPILLAI, Trial Attorney (DCBN 90001965)
AMBER M. CHARLES, Trial Attorney (DCBN 1035226)

      U.S. Department of Justice
      Civil Division
      Consumer Protection Branch
      450 5th Street NW, Suite 6400-S
      Washington, DC 20530
      Telephone: (202) 598-3855
      Email: Francisco.L.Unger@usdoj.gov

ISMAIL J. RAMSEY, United States Attorney (CABN 189820)
MICHELLE LO, Chief, Civil Division (NYBN 4325163)
DAVID M. DEVITO, Assistant United States Attorney (CABN 243695)

      Northern District of California
      450 Golden Gate Avenue
      San Francisco, California 94102
      Telephone: (415) 436-7200
      Email: David.Devito@usdoj.gov

*Attorneys for Plaintiff United States of America*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>       v.<br><br>ADOBE INC., a corporation,<br>MANINDER SAWHNEY, individually, and<br>DAVID WADHWANI, individually,<br><br>          Defendants. | Case No. 5:24-cv-03630-BLF<br><br>**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff, the United States of America ("the United States"), acting upon notification and referral from the Federal Trade Commission ("FTC"), for its Complaint alleges:

**NATURE OF THE CASE**

1.      Adobe Inc. ("Adobe") is one of the world's largest software companies, known for developing popular design and productivity software applications, such as Acrobat, Photoshop, and Illustrator. Adobe offers subscription plans to these and dozens of other products and services on its website, *Adobe.com*.

2.      For years, Adobe has harmed consumers by enrolling them in its default, most lucrative subscription plan without clearly disclosing important plan terms. Adobe fails to adequately disclose to consumers that by signing up for the "Annual, Paid Monthly" subscription plan ("APM plan"), they are agreeing to a year-long commitment and a hefty early termination fee ("ETF") that can amount to hundreds of dollars. Adobe clearly discloses the ETF only when subscribers attempt to cancel, turning the stealth ETF into a powerful retention tool that generates significant revenues by trapping consumers in subscriptions they no longer want.

3.      During enrollment, Adobe hides material terms of its APM plan in fine print and behind optional textboxes and hyperlinks, providing disclosures that are designed to go unnoticed and that most consumers never see. Adobe then deters cancellations by employing an onerous and complicated cancellation process. As part of this convoluted process, Adobe ambushes subscribers with the previously obscured ETF when they attempt to cancel. Through these practices, Adobe has violated federal laws designed to protect consumers.

4.      Defendants know that these inadequate APM plan disclosures harm and mislead consumers but continue to engage in these unlawful practices because better disclosures would hurt Adobe's bottom line by reducing subscription revenues. As one Adobe executive admitted, the hidden ETF is "a bit like heroin for Adobe" and "there is absolutely no way to kill off ETF or talk about it more obviously [without] taking a big business hit[.]"

5.      Adobe's misconduct does not stop with concealing key APM plan terms to maximize profits. Adobe utilizes other onerous cancellation procedures to trap consumers in subscriptions they no longer want. Consumers attempting to cancel online are forced to navigate numerous hurdles, including

hidden cancellation buttons and multiple, unnecessary steps such as pages devoted to password reentry, retention offers, surveys, and warnings. Consumers attempting to cancel via phone or chat experience dropped calls and chats, significant wait times, and repeated transfers. Adobe uses a dedicated "Retention" team to discourage subscribers who try to cancel. Adobe relies on such obstacles to thwart cancellations and retain subscription revenues, depriving consumers of a simple mechanism to cancel as required by law.

6.    To put an end to Adobe's unlawful conduct, the United States brings this lawsuit, seeking injunctive relief, civil penalties, equitable monetary relief, as well as other relief.

## JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

7.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355, as well as 15 U.S.C. §§ 45(m)(1)(A), 53(b), and 56(a), because this case involves claims arising under federal laws regulating commerce and is commenced by the United States.

8.    Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(2), (d), and 1395(a), as well as 15 U.S.C. § 53(b), because Defendants transact business in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

9.    Divisional assignment to the San Jose Division is proper under Civil Local Rule 3-2(e) because Adobe has its principal place of business in San Jose and because a substantial part of the events or omissions giving rise to the claims occurred there.

## PLAINTIFF

10.    The United States brings this action under Sections 5(a), 5(m)(1)(A), 13(b), 16(a), and 19, of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), 56(a), and 57b, as well as Section 5 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8404, which authorize the United States to seek, and this Court to order, permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, or other equitable relief, in addition to civil penalties, for Defendants' violations of the FTC Act, 15 U.S.C. § 45(a), and ROSCA, 15 U.S.C. § 8403.

**DEFENDANTS**

### A.    Adobe

11.    Defendant Adobe is a Delaware corporation with its principal place of business at 345 Park Avenue, San Jose, California 95110. Adobe transacts and has transacted business in this District and throughout the United States.

12.    At all times relevant to this Complaint, acting alone or in concert with others, Adobe has advertised, marketed, distributed, or sold subscriptions to its software products and services to consumers throughout the United States. Adobe has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

### B.    Maninder Sawhney

13.    Defendant Maninder Sawhney ("Sawhney") is the Senior Vice President of Digital Go To Market & Sales at Adobe, a position he has held since December 2018. At times relevant to this Complaint, acting alone or in concert with others, Sawhney formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Adobe, including acts and practices set forth in this Complaint.

14.    As Senior Vice President of Digital Go To Market & Sales, Sawhney has led a team that directs certain of Adobe's acts and practices set forth in this Complaint, including practices related to Adobe's subscription enrollment processes and material terms of Adobe's subscription plans. Sawhney has participated in and been involved in directing Adobe's unlawful conduct, including by making critical decisions about Adobe's relevant practices and by advising and steering Adobe's leadership regarding company strategy.

15.    Sawhney, in connection with the matters alleged in this Complaint, transacts or has transacted business in this District and throughout the United States.

### C.    David Wadhwani

16.    Defendant David Wadhwani ("Wadhwani") is the President of Digital Media Business at Adobe and reports directly to Adobe's Chief Executive Officer ("CEO"). At times relevant to this Complaint, acting alone or in concert with others, Wadhwani formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Adobe, including acts and practices set

forth in this Complaint.

17. As President of Digital Media Business, Wadhwani helps guide Adobe's digital subscription business strategy. Wadhwani supervises Sawhney and has participated in guiding and directing Sawhney's management of Adobe's acts and practices set forth in this Complaint, including practices related to Adobe's subscription enrollment processes and material terms of Adobe's subscription plans. Wadhwani has participated in and helped direct Adobe's unlawful conduct, including by participating in key decisions regarding Adobe's digital subscription offerings, providing approval for courses of action by his reports, and helping guide the work of various Adobe teams and personnel implementing Adobe's enrollment and cancellation policies.

18. Wadhwani, in connection with the matters alleged in this Complaint, transacts or has transacted business in this District and throughout the United States.

**THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT**

19. ROSCA, 15 U.S.C. § 8401 *et seq*., recognizes that "[c]onsumer confidence is essential to the growth of online commerce," and that "[t]o continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business." *Id.* § 8401.

20. Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a "negative option feature" unless the seller: (a) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (b) obtains the consumer's express informed consent before making the charge; and (c) provides simple mechanisms to stop recurring charges. *See id.* § 8403.

21. A "negative option feature" is defined as: "in an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w); *see* 15 U.S.C. § 8403.

22. Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404(a), and Section 18(d)(3) of the FTC Act, *id.* § 57a(d)(3), a violation of ROSCA constitutes a violation of an FTC rule under Section 18 of the

FTC Act, *id*. § 57a, and constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, *id.* § 45(a).

**DEFENDANTS' UNLAWFUL ACTIVITIES**

**I.   Adobe's Subscription-Based Business Model**

23.   Prior to 2012, Adobe typically sold its software to consumers under a perpetual licensing model, where the consumer paid for the product once and could use it indefinitely.

24.   In or around 2012, Adobe began shifting to a subscription-based licensing model, where consumers must pay for monthly or yearly access to Adobe's products, and where their subscription renews automatically. Under this model, Adobe earns more revenue the longer a consumer remains subscribed. Adobe's shift to the subscription model has significantly increased its recurring revenues.

25.   Adobe's subscription offerings include a wide array of software products and services for content design, publication, and cloud storage, including its flagship applications Acrobat, Photoshop, Illustrator, and Creative Cloud. Adobe has sold these subscriptions to a wide range of consumers on its website, *Adobe.com*, as part of Adobe's Digital Media business unit.

26.   Adobe's subscription revenue has nearly doubled in recent years. In 2019, Adobe earned $7.71 billion in subscription-based revenue. By 2023, subscription-based revenue accounted for $14.22 billion of Adobe's $19.41 billion in total annual revenue.

27.   Adobe offers three types of subscription plans to consumers: (1) "Monthly," (2) "Annual Paid Monthly" ("APM"), and (3) "Annual Prepaid."

28.   The APM plan is sometimes referred to by Adobe as "Yearly, billed monthly" or "Annual, billed monthly" ("ABM"). Internally and on *Adobe.com*, Adobe uses these terms interchangeably.

29.   Adobe frequently pre-selects the APM plan as a default selection in subscription enrollment flows.

30.   The APM plan accounts for most of Adobe's subscription revenues. Since at least 2019, the APM plan has included the following material terms, among others:

  a.   subscribers are automatically charged each month until they affirmatively cancel;

  b.   cancellation before the end of the year is subject to an ETF;

  c.   Adobe calculates the ETF amount as 50 percent of the "remaining contract

obligation,"—i.e., the customer will be "charged a lump sum amount" of 50 percent of the total monthly charges for the months remaining in the yearly contract;

    d.    subscribers who cancel before the end of the first year lose service at the end of the monthly billing period during which they cancel; and,

    e.    subscribers cancelling within 14 days of their first payment are entitled to a full refund.

31.    Adobe's subscription-based model incentivizes it to, on the front end, lock consumers into longer-term subscriptions like the APM plan, and, on the back end, discourage cancellation.

## II.   **Adobe's Unlawful Subscription Enrollment Practices**

32.    Consumers subscribe to Adobe products by using a computer or smart device to take one of multiple paths to begin the enrollment process, each of which is also known as an enrollment "flow." For example, consumers can go to *Adobe.com* and navigate to the page of the product to which they want to subscribe.

33.    For many products and services, Adobe offers free trials in addition to no-trial (or "buy now") subscriptions. Adobe automatically converts consumers who select the APM plan during a free trial enrollment to paid subscribers if they do not cancel their subscriptions before the trial period ends. Consumers who start with a "buy now" APM subscription, rather than a free trial, encounter substantially the same enrollment flow, except the "buy now" subscription flows do not contain text relating to a free trial.

34.    Regardless of the specific enrollment flow consumers encounter when they sign up, the segment or product they select, and whether they receive a free trial, consumers who have subscribed to an APM plan since at least 2019 have generally followed substantially the same enrollment flow provided in the example below, except that the enrollment flow many consumers have encountered, particularly prior to October 2021, does not include the initial plan selection page. Adobe's enrollment flows fail to clearly and conspicuously disclose material terms of the APM plan, including (1) that the length of the subscription term is one year, (2) that cancellation before the end of the first year is subject to an ETF, and (3) the amount of the ETF.

**A.**     **Adobe's Unlawful Enrollment Flows**

35.     Paragraphs 36 to 52 provide an example of an illustrative enrollment flow for consumers enrolling in a free trial for an APM plan. In this example flow, consumers who select a "Free trial" button for a product are directed to additional pages, including pages for: (1) plan selection, (2) email entry, and (3) payment entry.

**1.**     **Plan Selection Page**

36.     Adobe's enrollment flows often begin with a plan selection page that presents available subscriptions and their prices, like the one illustrated below.

**Enrollment Flow Example 1:** Plan Selection Page In Creative Cloud Free Trial Flow, May 2023



37.     The element of each plan that Adobe displays most prominently is a price, with the APM plan showing the lowest dollar amount. Adobe frequently also pre-selects the APM plan as a default.

38.     In Enrollment Flow Example 1, the bottom of each plan selection box includes a less prominent line of text, followed by a "tooltip" icon: ⓘ. In particular, the APM plan box states: "*Fee applies if you cancel after 14 days.* ⓘ."

39.     Consumers navigating the enrollment flow do not see the additional text contained in the tooltip (i.e., a small pop-up text box), which is in an even less prominent font, unless they hover over or click the ⓘ icon. Customers using a touchscreen device (e.g., a phone or tablet) must tap the ⓘ icon to view the tooltip. Consumers who access the ⓘ icon for the APM plan in this example flow reveal a tooltip that reads: "If you cancel after 14 days, your service will continue until the end of that month's billing period, and you will be charged an early termination fee."

**Enrollment Flow Example 2:** APM Plan Tooltip In Creative Cloud Free Trial Flow, May 2023



40.     Enrollment Flow Example 2 is a zoomed-in version of the plan selection list featured on Adobe's plan selection page. In this example, the tooltip icon is being engaged with (i.e., hovered over or clicked), revealing the informational text it displays.

41.     As Enrollment Flow Example 2 shows, a consumer who accessed the information contained behind the tooltip is still not given concrete information about the amount of the ETF, how it is calculated, or the subscription term, if any, to which it applies.

42.     As Enrollment Flow Examples 1 and 2 show, the plan selection page does not state anywhere that the APM plan requires a one-year commitment. Consumers who do not access the ⓘ icon

1    are not informed that the "fee" mentioned in the APM box in less prominent text is an ETF.

2    43.    Moreover, the plan selection page, even in the text accessible only through the tooltip, does not clearly explain what constitutes "early termination," *i.e.*, that cancelling before paying for a full year of service will result in a fee.

44.    Finally, the plan selection page does not disclose *at all* the amount of the fee that consumers would be charged for early cancellation.

45.    Adobe often presents consumers with a plan selection page similar to the one described above. However, for certain consumers—particularly prior to October 2021, but also for many consumers since then—Adobe has not included a plan selection page at any point. In these enrollment flows, consumers do not even see other subscription plan options and do not have an opportunity to view the tooltip text.

### 2.    Email Entry Page

46.    Whether consumers encounter a plan selection page, or Adobe pre-selects the APM Plan and omits a plan selection page as set forth in Paragraph 45, Adobe then directs consumers to additional pages, often including one that requires consumers to provide an email address. Nothing on this page mentions an annual commitment, an ETF, or a fee amount.

### 3.    Payment Entry Page

47.    The final enrollment page is often a payment entry page (an example of which is shown below), where Adobe requires consumers to enter their payment information to enroll.

**<u>Enrollment Flow Example 3:</u>** Payment Page In Creative Cloud Free Trial Flow, May 2023



48.     Enrollment Flow Example 3 provides an example of the page in Adobe's enrollment flows that directs consumers to enter their payment information. The page also provides information about the APM plan's terms, but in small inconspicuous font beneath that entry form, which Adobe knows many consumers do not notice or read. In the example above, that text states:

> By clicking "Agree and subscribe", you agree: **After your trial ends, you will be charged US\$[subscription price] (plus tax) monthly. At the end of your one-year term, your subscription will automatically renew monthly until you cancel (price subject to change). Cancel before your trial ends and you won't be charged. No annual commitment required after the first year. Cancel anytime via Adobe Account or Customer Support**. Cancel before [date] to get a full refund and avoid a fee. You also agree to the Terms of Use and the Subscription and Cancellation Terms.

49.     This fine print paragraph includes the *first and only* mention across the entire flow of an "annual commitment." Even here the commitment is not explicitly linked to any ETF or other charge. The reference to cancelling to "avoid a fee" does not mention the ETF by name or state its amount.

50.     In Enrollment Flow Example 3, the blue text labeled "Subscription and Cancellation Terms" is a hyperlink that consumers may click on to reveal a pop-up window with additional terms. Consumers can enroll in subscriptions without clicking that link, and Adobe knows most consumers do not click it before enrolling in an APM plan.

51.     Even if a consumer clicked on the "Subscription and Cancellation Terms" hyperlink, they would then have to scroll to the bottom of the pop-up window (through multiple screens of text if on a mobile device) to find cancellation terms, which in this example enrollment flow state:

> You can cancel your subscription anytime via your Adobe Account page or by contacting Customer Support*. If you cancel within 14 days of your initial order, you'll be fully refunded. Should you cancel after 14 days, you'll be charged a lump sum amount of 50% of your remaining contract obligation and your service will continue until the end of that month's billing period.

52.     This description, if a consumer were to find it, does not include the word "fee" or phrase "Early Termination Fee," and thus does not match earlier references to a "fee" for cancellation. Nor does this text clarify the length of the subscription term or what it means by "your remaining contract obligation."

53.     In contrast to Enrollment Flow Example 3, Adobe's enrollment flows for some users,

including those who have enrolled in subscriptions that Adobe has marketed for use in particular business or education contexts (which Adobe may refer to as "Business and Teams" or "Teams" users, "Students or Teachers" or "STE," "Schools and Universities," or "Education"), have at times not displayed a hyperlink to terms and conditions on the payment entry page and instead have enabled consumers to view those terms only *after* Adobe has collected their payment information.

### B. Defendants Know About and Profit from Consumer Confusion Regarding the APM Plan

54.     Adobe's enrollment practices have generated frequent complaints from subscribers of the APM plan, including to the Better Business Bureau ("BBB"), to state law enforcement agencies, on social media, on Adobe's community support web pages, and to Adobe itself.

55.     In their complaints, consumers have reported they did not understand what they were signing up for and were surprised to learn they were enrolled in a plan that requires a one-year commitment or that imposes a hefty ETF. The ETF and related confusion have been top drivers of customer support contacts, dissatisfied customers, and customer inquiry escalations at Adobe.

56.     Defendants know about and have monitored numerous complaints received directly from consumers and from other sources like the BBB, and they know that consumers are often confused about or misunderstand the terms of the APM plan, including its one-year commitment and ETF.

57.     Defendants have also faced outside pressure to change their enrollment practices, including, for example, from a report that Forrester Research Inc. released in May 2022, which found most consumers had difficulty trying to determine how much they would be forced to pay if they cancelled a subscription. Defendants know that Adobe employees and executives have also internally expressed concern about consumer confusion and harm caused by Adobe's enrollment practices.

58.     Despite knowing about widespread consumer confusion regarding APM terms, Defendants have refused to remedy their unlawful practices because Adobe has profited handsomely from these practices. Indeed, Adobe's insufficient APM disclosures are a deliberate company strategy that Defendants have contemplated ending but have ultimately decided to continue because fewer consumers would sign up for the APM plan if Adobe clearly disclosed its material terms, and because many of the

consumers who do sign up for APM plans would cancel their subscriptions earlier if Adobe did not charge a hefty ETF.

**III.    Sawhney's Supervision of, and Participation in, Adobe's Unlawful Enrollment Practices**

59.    Since at least 2019, Maninder Sawhney has played a central role in implementing and directing Adobe's ETF and APM enrollment flow practices.

60.    Specifically, Sawhney has led a team that oversees and manages Adobe's ETF policies.

61.    Sawhney and his team have closely tracked consumer complaints about the ETF, analyzed and proposed changes to ETF policies, conducted analysis of the ETF's revenue implications (including analysis of the revenue Adobe would lose if it more clearly disclosed or eliminated the ETF), and briefed and advised Adobe leadership about ETF issues and business strategy.

62.    Sawhney has made critical decisions steering Adobe's ETF approach—including directing Adobe's strategy regarding setting the ETF amount, selecting Adobe's default plan, the substance of disclosures offered to consumers during enrollment, and what enrollment flows to make available to different consumers.

63.    Through his work monitoring ETF complaints and managing the company's ETF policies, Sawhney has been keenly aware of the significant harm the ETF has caused to consumers.

64.    Sawhney has reviewed and discussed many consumer complaints stating that the APM plan's material terms were not clearly disclosed.

65.    Sawhney has also regularly reviewed critical assessments of Adobe's ETF and APM plan practices prepared by various Adobe teams, including customer experience, customer support, and product management teams. These assessments have emphasized that the APM plan disclosures during the enrollment process are not clear, that many consumers are unaware of the ETF and the one-year term, and that these unclear disclosures lead to widespread consumer surprise and anger.

66.    Sawhney has himself pointed out that many APM plan subscribers are unaware of the ETF and its one-year commitment, but he has continued to help direct and implement Adobe's unremedied ETF practices to protect the company's revenues.

67.    Sawhney has discussed regulatory scrutiny bearing on Adobe's ETF disclosures with fellow executives, and he and his reports have discussed legal issues involving Adobe's practices relating

to auto-renewal subscriptions (*i.e.*, negative option subscriptions), which are governed by ROSCA. For example, Sawhney has participated in discussions among Adobe executives regarding the Forrester Research Inc., report (*see supra*, ¶ 57) that analyzed Adobe's hiding of the ETF and referenced possible ROSCA violations, and he has overseen his team's preparation of materials for circulation within the company that reference regulatory concerns regarding Adobe's ETF disclosures.

**IV.    Wadhwani's Supervision of, and Participation in, Adobe's Unlawful Enrollment Practices**

68.    David Wadhwani is Adobe's President of Digital Media Business. In this role, he reports directly to Adobe's CEO, Shantanu Narayen, and helps guide Adobe's overall business strategy regarding online subscriptions, including the APM plan.

69.    Wadhwani was previously a Senior Vice President of the Digital Media Business. He has worked in a leadership role within the Digital Media Business for more than a decade.

70.    Wadhwani was one of the chief architects behind Adobe's pivot from its legacy product offerings to its current digital subscription model based on maximizing recurring revenues.

71.    As a senior executive in the Digital Media Business unit, Wadhwani has participated in and helped to direct Adobe's ETF and APM plan enrollment flow practices.

72.    Sawhney has reported directly to Wadhwani, including to discuss and receive approval for proposed courses of action and policy changes involving the ETF.

73.    As Sawhney's supervisor, Wadhwani has received detailed briefings prepared by Sawhney's team regarding ETF policies, consumer complaints, and business strategy.

74.    Wadhwani has participated in discussions with Sawhney—and with other executives— regarding inadequate APM plan disclosures and consumer anger over the surprise ETF. These discussions have addressed many aspects of the company's ETF strategy, including details of Adobe's APM plan enrollment flows, disclosures made to consumers, plan defaulting, and how adjustments to enrollment flows would impact APM plan sign-up and retention rates and Adobe's revenues. Wadhwani has provided detailed feedback and guidance to Sawhney on these issues.

75.    Like Sawhney, Wadhwani has internally recognized how Adobe's hidden ETF harms consumers, but he has contributed to and directed ETF policies that prioritize Adobe's revenues over clear disclosures and has continued to participate in and help direct Adobe's unlawful practices.

V.      **Adobe's Unlawful Cancellation Practices**

76.     Adobe auto-renews its customers' subscription plans and continues to charge customers until they affirmatively act to cancel their subscriptions.

77.     Adobe generally provides subscribers with two primary options to cancel a subscription: (1) online self-cancellation; and (2) contacting customer service via online chat or phone. However, Teams and Education subscribers cannot self-cancel online.

78.     As set forth below, from at least as early as August 2019 until at least June 2023, neither cancellation method provided consumers with a simple way to cancel their subscriptions.

A.      **Self-Cancellation Flow on _Adobe.com_**

79.     Most Adobe customers have the option to self-cancel their subscriptions online.

80.     Adobe has redirected consumers seeking to cancel online into a flow designed to promote retention and frustrate cancellations. In contrast to an enrollment process that often includes only three screens, to cancel on _Adobe.com_, consumers have generally had to navigate numerous pages with multiple options, much of which is wholly unnecessary to honor consumers' cancellations requests. Where consumers have failed to click the appropriate option, Adobe has required them to restart the entire cancellation process from the beginning.

81.     To cancel, consumers must first locate the cancellation page. Adobe has previously included a cancellation option on consumers' account management page, but as part of its efforts to "optimize" its flow to reduce cancellation attempts, Adobe redesigned its cancellation flow to conceal the cancellation button, requiring consumers in many instances to navigate through several pages to find and even begin the self-cancellation process.

82.     For example, at relevant times, consumers have had to first locate the account management page, then correctly choose a "Manage plan" hyperlink among various similar hyperlinks (e.g., "Access your services" and "Edit billing and payment"), and finally identify the "Cancel your plan" button.

83.     Locating and clicking on a "Cancel your plan" button does not result in cancellation. Instead, after users have clicked "Cancel your plan," Adobe has forced them to undergo a convoluted process requiring several additional steps, some of which were wholly unnecessary to complete cancellation.

84. For example, at relevant times, consumers who clicked "Cancel your plan" had to reenter their Adobe password—regardless of whether the subscriber had already signed in before reaching the screen. Also, consumers have been sent to a mandatory Feedback page, requiring them to provide reasons for cancellation. This page has not informed consumers that their cancellation request was incomplete.

85. Additionally, consumers have had to navigate through several web pages, pop-ups, and offers designed for retention. For example, at relevant times, consumers had to decline an offer to "switch products or change some part of your plan." Consumers have also had to reject various "save offers" by Adobe, which could include discount offers, offers to switch to other products, and an offer to chat with an Adobe representative and "check for a custom deal."

86. Finally, Adobe has required consumers to review and "confirm" the multitude of consequences that would follow the cancellation. For example, at relevant times, Adobe placed in prominent red font the ETF amount that APM plan subscribers would be charged if they cancelled their subscription.

87. Many subscribers learn for the first time about the ETF—and its amount—during cancellation. Adobe offers no way to dispute this charge using the self-cancel flow. Subscribers have had to either pay the fee to cancel or reach out to Adobe's customer service to discuss or dispute the fee. If they chose the latter route, they could not complete self-cancellation.

88. Numerous consumers have also complained about other barriers to cancellation, including that online cancellation buttons were missing or did not work for them.

**B.** **Cancellation By Contacting Customer Service**

89. Adobe's subscribers generally can also attempt to cancel by contacting Adobe's customer service via phone or online chat. Like the self-cancellation process, Adobe's customer service cancellation process prioritizes retaining consumers and continuing to collect subscription revenue rather than providing a simple mechanism to cancel.

90. Subscribers who have attempted to cancel via customer service have encountered several obstacles that impede or delay their attempts to cancel. For example:

　　　a. customer service is wholly unavailable to individual consumers between Friday and Sunday evenings;

b.    subscribers have had their calls or chats either dropped or disconnected and have had to re-explain their reason for calling when they re-connect;

c.    if a subscriber is inactive in an online customer service chat for just three minutes, the chat automatically ends, forcing the subscriber to restart the process; and,

d.    subscribers have been transferred to one or more Adobe representatives during their call or chat, forcing them to encounter delays, re-explain themselves, and request cancellation multiple times.

91.    Adobe knows that many consumers have been impeded from easily canceling. Indeed, Adobe has designed and evaluated its cancellation procedures partly with the goal of preventing cancellations and maximizing customer retention.

92.    For instance, Adobe's standard operating procedure during relevant times has been to transfer calls from APM plan subscribers seeking to cancel to Adobe's retention personnel, who are trained to retain customers attempting to cancel their subscriptions and "save" them from canceling in order to protect Adobe's revenue.

93.    Once subscribers reach an Adobe representative on the phone or chat and verify their account, they encounter retention tactics and obstacles to completing cancellation similar to those that users experience when trying to self-cancel online.

94.    For example, Adobe representatives typically ask subscribers to provide a reason for cancelling before proceeding with their request. Depending on the subscriber's stated reason for cancelling, Adobe instructs representatives to present multiple retention offers before agreeing to cancel.

95.    Many subscribers who insist on cancelling encounter resistance and delay from Adobe representatives, such as additional follow-up questions. For example, a representative may ask a free trial subscriber if they would consider postponing cancellation until the end of their trial period, or may ask an APM plan subscriber if they are willing to postpone cancelling in exchange for receiving several free months.

96.    Many subscribers attempting to cancel via phone or chat have been subjected to a time-consuming and burdensome process. For example, numerous subscribers attempting to cancel via phone have been subject to calls lasting upwards of 20 or 30 minutes.

97.     Adobe instructs its representatives to use the ETF as a method of retaining subscribers and discouraging cancellations, and to invoke the ETF when subscribers are not "saved" by retention offers, such as discounts.

98.     Adobe has waived the ETF for some consumers, including those who threaten legal action against Adobe, but it has not disclosed that practice to consumers generally.

99.     Additionally, Adobe provides no refunds or only partial refunds to some subscribers who incur charges after an attempted, unsuccessful cancellation.

100.    In numerous instances, subscribers who have requested to cancel through Adobe's customer service believe they have successfully cancelled but continue to be charged. Some of these subscribers do not realize for months that Adobe is continuing to charge them, and only learn about the charges when they review their financial accounts.

101.    Subscribers whose cancellations do not take effect are forced to restart their attempts to cancel. Because Adobe does not offer the ability to request or obtain a refund of erroneous charges through its self-cancellation flow, such subscribers must contact customer service to stop the charges and request a refund. These subscribers again face all the difficulties described above.

**C.      Adobe Wields the Surprise Early Termination Fee to Discourage Cancellations**

102.    As set forth above, regardless of whether a consumer attempts to cancel through self-cancellation or by contacting customer service, Adobe has used the ETF to discourage cancellations.

103.    While Adobe obscures the ETF during enrollment, it highlights it during cancellation. Adobe's manipulative enrollment practices make the ETF an effective retention tool: since many APM plan subscribers do not know about the fee until they attempt to cancel, they are surprised and discouraged from cancelling upon learning about the fee and its amount, which can sometimes be several hundred dollars.

**D.      Adobe Knows Its Customers Struggle to Cancel Unwanted Subscriptions**

104.    Adobe knows about the barriers consumers face when attempting to cancel their subscriptions and has known for years that it was failing to provide consumers with a simple way to cancel subscriptions.

105.    As described above, Adobe has tracked negative public comments about its product and

reputation. Adobe knows its cancellation practices have generated numerous complaints from subscribers, including to the BBB, state law enforcement agencies, and to Adobe itself.

106. The complaints describe a range of difficulties consumers have encountered when attempting to cancel an Adobe subscription. As examples:

a. One consumer was so frustrated with trying to cancel their subscription they emailed Adobe's CEO Narayen directly: "I am desperate. I no longer know how to get help. I am writing for the umpteenth time . . . I have made written online requests galore, I have made 4 phone calls to Adobe's advertised phone numbers. I get no help online and no help by phone. Instead I spend an hour being transferred from one person to another and eventually being hung up on. . . . What does it take to cancel the subscription?"

b. Another consumer stated: "I have corresponded with Adobe on the phone and via their chat support over 3 times in the last few months to try and cancel my membership. Each time I try to cancel, there is a rigorous negotiation and instead of allowing the user to cancel their account, they offer 2 months at no charge."

c. As to self-cancellation, yet another consumer reported: "Adobe literally will not let me cancel my subscription. Online I'm put thru an [sic] loop to continually sign in and cannot move forward to cancel."

107. Adobe has also internally acknowledged and discussed ways that its online and customer-service cancellation processes impede cancellation attempts and has compiled data showing that many consumers trying to cancel have been subjected to inefficiencies such as substantial delays, lengthy calls, multiple agent transfers, and repeat calls without resolution.

108. At least as early as October 2019, Adobe management knew that its online self-cancellation process does not communicate to customers who accept a "save offer" that they have not cancelled their plans and may still be subject to ETF or automatic subscription renewal. They also knew subscribers contacting customer service similarly do not understand the implications of accepting save offers.

109. Adobe also knows its cancellation practices have generated negative commentary by third parties, including, for example, an August 2021 video case study by a company called Growth Design Inc.

titled "Adobe: The Psychology of User Offboarding," which highlights and criticizes various manipulative and otherwise complicated aspects of Adobe's self-cancel flow.

### E. Adobe Has Made It More Difficult for Consumers to Cancel Subscriptions

110. Despite the foregoing, until at least June 2023, Adobe did not change its cancellation flow to provide consumers with a simple mechanism to cancel their Adobe subscriptions.

111. Indeed, instead of improving the cancellation process for subscribers, Adobe has at times added additional friction to deter cancellations.

112. For example, between August 2019 and June 2023, Adobe added additional screens to the cancellation flow. Similarly, as set forth in Paragraph 81, Adobe has at times removed the cancellation link from the account management page to reduce subscription cancellation rates.

## VI. Adobe's Knowledge of ROSCA

113. Adobe is one of the world's largest software companies. It has extensive legal resources, including in-house and outside counsel. Adobe's management routinely conferred with its counsel regarding legal and regulatory issues relating to Adobe's subscriptions.

114. Adobe and its executives were aware of significant government and regulatory scrutiny into its subscription enrollment and cancellation practices, including a Civil Investigative Demand the FTC issued to Adobe in June 2022 probing potential violations of ROSCA related to Adobe's APM plan disclosures and cancellation mechanisms. Adobe has nevertheless persisted in its violative practices to the present day.

115. Adobe and its executives also had other indications that its practices were illegal, including, for example, the May 2022 Forrester Research Inc. report discussed in Paragraph 57, which specifically referenced ROSCA and explained how Adobe's practices—including insufficient disclosures and deceptive enrollment flow features that hid critical information—appeared to violate ROSCA.

116. Adobe employees, including executives and members of Sawhney's team, have discussed regulatory scrutiny and legal risks relating to Adobe's ETF policies, including in discussions regarding the adequacy of Adobe's enrollment flow disclosures.

117. Adobe executives have also regularly discussed widespread consumer confusion and anger regarding the ETF and the APM plan's one-year commitment and widespread consumer complaints

regarding how challenging it is to cancel subscriptions. This includes employees repeatedly acknowledging that Adobe has misled consumers by failing to clearly inform them of the ETF, and acknowledgment by executives that Adobe hides key disclosures where many consumers are unlikely to see them. These discussions indicate that Adobe is aware that it is violating ROSCA's requirements.

118.    Adobe has been forced to repeatedly grapple with how its ETF and APM plan enrollment and cancellation policies run afoul of regulatory requirements, including ROSCA, but it has continued to engage in violative conduct to maximize its subscription revenues.

**VIOLATIONS OF ROSCA**

119.    Defendants offer consumers negative option features as defined by ROSCA, including in subscriptions for products and services including the monthly, annual paid monthly, annual billed monthly, yearly billed monthly, yearly paid monthly, annual prepaid, yearly paid upfront, annual paid upfront, and yearly billed upfront plans.

**COUNT I**

*Against All Defendants*

**Failure to Clearly and Conspicuously Disclose Material Terms**

120.    Paragraphs 1–119 are incorporated as if set forth herein.

121.    In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described above, Defendants have failed to clearly and conspicuously disclose all material terms of the transaction before obtaining the consumer's billing information, including, for example, the subscription's billing and renewal terms, the length of the subscription, what cancellation fees will apply and when, and the amount of those fees.

122.    Defendants' practices as set forth are violations of ROSCA, 15 U.S.C. § 8403(1), and thus violations of Section 18 of the FTC Act, 15 U.S.C. § 57a, 15 U.S.C. § 8404(a), and therefore constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT II**

*Against All Defendants*

**Failure to Obtain Express Informed Consent**

123.    Paragraphs 1–119 are incorporated as if set forth herein.

124.    In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described above, Defendants have failed to obtain the consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for the transaction.

125.    Defendants' practices as set forth are violations of ROSCA, 15 U.S.C. § 8403(2), and thus violations of Section 18 of the FTC Act, 15 U.S.C. § 57a, 15 U.S.C. § 8404(a), and therefore constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT III**

*Against Adobe*

**Failure to Provide a Simple Cancellation Mechanism**

126.    Paragraphs 1–119 are incorporated as if set forth herein.

127.    In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described above, Adobe has failed to provide simple mechanisms for a consumer to stop recurring charges for the good or service to the consumer's credit card, debit card, bank account, or other financial account.

128.    Adobe's practices as set forth are violations of ROSCA, 15 U.S.C. § 8403(3), and thus violations of Section 18 of the FTC Act, 15 U.S.C. § 57a, 15 U.S.C. § 8404(a), and therefore constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

129.    Defendants have engaged in these unlawful acts knowingly, with knowledge of applicable regulations and with knowledge of numerous consumer complaints.

**ONGOING CONDUCT**

130.    Based on the facts and violations of law alleged in this Complaint, the United States and the FTC have reason to believe that Defendants are violating or are about to violate laws enforced by the FTC, including for reasons set forth below.

131.    First, Defendants have a long history of continuous conduct of the type described above.

132.    Second, Defendants have continued to employ at least some of their unlawful practices even after learning in 2022 about the FTC's investigation into possible ROSCA violations relating to inadequate disclosures and complex cancellation mechanisms.

133.    Third, Defendants have repeatedly decided against rectifying some of Adobe's unlawful practices because of the revenue implications.

134.    Fourth, Defendants retain the means, ability, and incentive to continue or resume their pattern of unlawful conduct in designing enrollment and cancellation processes for Adobe's lucrative subscription plans.

## CONSUMER INJURY

135.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of ROSCA and the FTC Act. Absent injunctive relief by this Court, Adobe is likely to continue to injure consumers and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

136.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt violations of any provision of law enforced by the FTC, including ROSCA.

137.    Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 5 of ROSCA, 15 U.S.C. § 8404, authorizes the Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of ROSCA, including the rescission or reformation of contracts, restitution, the refund of monies paid, and disgorgement of ill-gotten monies.

138.    Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), as modified by Section 4 of the Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, and Section 1.98(c) of the FTC's Rules of Practice, 16 C.F.R. § 1.98(c), authorizes this Court to award monetary civil penalties for each violation of ROSCA committed with actual knowledge or knowledge fairly implied.

139.    Defendants violated ROSCA with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

140.    Each instance in which Defendants have failed to comply with ROSCA constitutes a separate violation for the purpose of assessing monetary civil penalties.

1

**PRAYER FOR RELIEF**

2
WHEREFORE, Plaintiff requests that this Court:

3
A.     Enter judgment against Defendants and in favor of the United States for violations of

4
ROSCA as alleged in this Complaint;

5
B.     Impose monetary civil penalties on Defendants for each violation of ROSCA;

6
C.     Enter a permanent injunction to prevent future violations of ROSCA by Defendants;

7
D.     Award monetary and other relief within the Court's power to grant; and

8
E.     Award any additional relief as the Court determines to be just and proper.

9

**DEMAND FOR JURY TRIAL**

10
The United States hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the

11
Federal Rules of Civil Procedure.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF

Dated: June 17, 2024

Respectfully submitted,

*Of Counsel:*

FOR THE UNITED STATES OF AMERICA:

SANA CHAUDHRY
DANIEL WILKES
Attorneys
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
Tel: (202) 326-2679 (Chaudhry)
Tel: (202) 326-3679 (Wilkes)
SChaudhry@ftc.gov
DWilkes@ftc.gov

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

ARUN G. RAO
Deputy Assistant Attorney General

AMANDA N. LISKAMM
Director
Consumer Protection Branch

LISA K. HSIAO
Senior Deputy Director

ZACHARY A. DIETERT
Assistant Director

*/s/ Francisco L. Unger*
FRANCISCO L. UNGER
ZACHARY L. COWAN
WESLINE N. MANUELPILLAI
AMBER M. CHARLES
Trial Attorneys
Consumer Protection Branch
U.S. Department of Justice
450 5th Street, N.W. Suite 6400-S
Washington, D.C. 20530
(202) 598-3855 (Unger)
Francisco.L.Unger@usdoj.gov

ISMAIL J. RAMSEY
United States Attorney

DAVID M. DEVITO
Assistant United States Attorney
Northern District of California