1   Sheila A.G. Armbrust (SBN 265998)
    sarmbrust@sidley.com
2   Lauren C. Freeman (SBN 324572)
    lfreeman@sidley.com
3   SIDLEY AUSTIN LLP
    555 California Street, Suite 2000
4   San Francisco, CA 94104
    Telephone:  415-772-1200
5   Facsimile:  415-772-7400

6   Phillip Shaverdian (SBN 328657)
    pshaverdian@sidley.com
7   SIDLEY AUSTIN LLP
    350 South Grand Avenue
8   Los Angeles, CA 90071
    Telephone:  213-896-6000
9   Facsimile:  213-896-6600

Mark D. Hopson (*pro hac vice*)
mhopson@sidley.com
Benjamin M. Mundel (*pro hac vice*)
bmundel@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone:  202-736-8000
Facsimile:  202-736-8711

Christina C. Koenig (*pro hac vice*)
christina.koenig@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Ste. 2000
Dallas, TX 75201
Telephone:  214-969-3300
Facsimile:  214-969-3400

10  *Attorneys for Defendants*
    *ADOBE INC., MANINDER SAWHNEY,*
11  *and DAVID WADHWANI*

12                    UNITED STATES DISTRICT COURT

13                 NORTHERN DISTRICT OF CALIFORNIA

14                          SAN JOSE DIVISION

15  UNITED STATES OF AMERICA,

16                    Plaintiff,

17          vs.

18  ADOBE INC., a corporation, MANINDER
    SAWHNEY, individually, and DAVID
19  WADHWANI, individually,

20                    Defendants.

21

22

23

24

Case No.  5:24-cv-03630-BLF

**DEFENDANTS ADOBE INC.'S,
MANINDER SAWHNEY'S, AND DAVID
WADHWANI'S CORRECTED NOTICE OF
MOTION AND MOTION TO DISMISS
COMPLAINT; MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT THEREOF**

Assigned to:  Hon. Beth Labson Freeman

Date:   February 27, 2025
Time:  9:00 a.m.
Place:  Courtroom 3, 5th Floor

**Complaint Filed:  June 17, 2024**

25

26

27

28

1

## <u>NOTICE OF MOTION AND MOTION TO DISMISS</u>

2

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

3

Please take notice that on February 27, 2025, at 9:00 a.m., Defendants Adobe Inc., Maninder

4

Sawhney, and David Wadhwani (collectively, "Defendants") will bring for hearing this Motion to

5

Dismiss the Complaint, before the Honorable Judge Beth Labson Freeman, San Jose Courthouse,

6

Courtroom 3, 5th Floor, 280 South First Street, San Jose, CA 95113.

7

The Court should dismiss this action in its entirety under Rule 12(b)(6) because Plaintiff the

8

United States of America has failed to state a claim on which relief may be granted. Plaintiff asserts

9

claims against Defendants under the Restore Online Shoppers' Confidence Act (ROSCA). But

10

Plaintiff has failed to plausibly allege that Defendants violated ROSCA in any respect.

11

This motion is based on the attached memorandum, Defendants' Request for Judicial Notice

12

and Consideration of Documents Incorporated by Reference, the Declaration of Benjamin M.

13

Mundel in Support of Defendants' Motion to Dismiss and all Exhibits attached thereto, and such

14

argument as may be presented before or after the hearing on this matter.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT; MEMORANDUM OF POINTS & AUTHORITIES
CASE NO. 5:24-CV-3630-BLF

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................3

    A.    Adobe's Subscription Services ........................................................3

    B.    Adobe's Cancellation Mechanisms..................................................6

    C.    ROSCA and FTC Guidance ............................................................7

LEGAL STANDARD.........................................................................................................8

ARGUMENT ......................................................................................................................8

I.    The Complaint Fails to Adequately Allege That Adobe Sells Negative Options Subject To ROSCA. ..........................................................................................8

II.    The Court Should Dismiss Counts I and II...............................................9

    A.    Adobe "clearly and conspicuously" disclosed the material terms of its "Annual, paid monthly" plan.................................................10

        1.    Adobe clearly and conspicuously disclosed that its "Annual, paid monthly" plan was an annual plan. ...................................................11

        2.    Adobe clearly and conspicuously disclosed the early cancellation fee. ..........12

        3.    Adobe clearly and conspicuously disclosed the cancellation fee methodology. ..................................................................14

    B.    Adobe satisfied ROSCA's informed consent requirement. ........................................16

III.    The Court Should Dismiss Count III. .......................................................16

    A.    ROSCA's "simple mechanisms" requirement. ..........................................17

    B.    The complaint does not plausibly allege that Adobe's cancellation mechanisms violate ROSCA. ................................................................17

        1.    The complaint does not plead facts showing that Adobe's online cancellation flow was not a "simple mechanism." ..........................................17

        2.    The complaint fails to plead that Adobe's phone and chat processes were not "simple mechanisms." ..................................................19

        3.    The Constitution prevents interpreting ROSCA to require one-step cancellation or prohibit retention efforts................................................20

IV.    The Court Should Dismiss The Demand For Civil Penalties. .................................................22

CONCLUSION..................................................................................................................23

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)......................................................................................................8

*Barrer v. Chase Bank USA, N.A.,*
    566 F.3d 883 (9th Cir. 2009) ...............................................................................10, 17

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)..............................................................................................8, 19

*Berman v. Freedom Fin. Network, LLC,*
    30 F.4th 849 (9th Cir. 2022) .....................................................................................15

*Butcher v. Knudsen,*
    38 F.4th 1163 (9th Cir. 2022) .............................................................................20, 21

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,*
    447 U.S. 557 (1980).................................................................................................21

*Chabolla v. ClassPass Inc.,*
    No. 4:23-CV-00429-YGR, 2023 WL 4544598 (N.D. Cal. June 22, 2023) .............16

*Ebner v. Fresh, Inc.,*
    838 F.3d 958 (9th Cir. 2016) ...............................................................................10, 17

*Edmundson v. Klarna, Inc.,*
    85 F.4th 695 (2d Cir. 2023) .....................................................................................17

*FCC v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012).................................................................................................20

*FTC v. Am. Future Sys., Inc.,*
    No. CV 20-2266, 2024 WL 1376026 (E.D. Pa. Mar. 29, 2024)........................20, 23

*FTC v. Amazon.com, Inc.,*
    No. 2:23-cv-00932-JHC, 2024 WL 2723812 (W.D. Wash. May 28, 2024)............10

*FTC v. D-Link Sys., Inc.,*
    No. 3:17-CV-00039-JD, 2017 WL 4150873 (N.D. Cal. Sept. 19, 2017) ...............22

*FTC v. Health Formulas,*
    2015 WL 2130504 (D. Nev. May 6, 2015)...............................................................16

*FTC v. LendingClub Corp.*,
    No. 18-CV-02454-JSC, 2020 WL 2838827 (N.D. Cal. June 1, 2020) ..................................10

*FTC v. Stefanchik*,
    559 F.3d 924 (9th Cir. 2009) ..................................................................................................10

*George v. McDonough*,
    596 U.S. 740 (2022).................................................................................................................10

*Gershfeld v. TeamViewer US, Inc.*,
    No. 21-55753, 2023 WL 334015 (9th Cir. Jan. 20, 2023).......................................................10

*Gonzalez v. Planned Parenthood of L.A.*,
    759 F.3d 1112 (9th Cir. 2014) ...................................................................................................8

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972).................................................................................................................22

*Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*,
    730 F.3d 494 (6th Cir. 2013) ...................................................................................................11

*Hall v. Time, Inc.*,
    857 Fed. App'x. 385 (9th Cir. May 24, 2021) .........................................................................10

*Hall v. Time, Inc.*,
    No. SACV 19-01153-CJC(ADSx), 2020 WL 2303088 (C.D. Cal. Mar. 13, 2020) ...............14

*Heinz v. Amazon.com, Inc.*,
    No. 2:23-cv-00282 WBS AC, 2023 WL 4466904 (E.D. Cal. July 11, 2023) .........................12

*Hodges v. King's Hawaiian Bakery W., Inc.*,
    2021 WL 5178826 (N.D. Cal. Nov. 8, 2021) ..........................................................................11

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*,
    559 U.S. 573 (2010).................................................................................................................22

*Junior Sports Mags. Inc. v. Bonta*,
    80 F.4th 1109 (9th Cir. 2023) ..................................................................................................21

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*,
    383 F.3d 1337 (Fed. Cir. 2004) (en banc)...............................................................................23

*Morrell v. WW Int'l, Inc.*,
    551 F. Supp. 3d 173 (S.D.N.Y. 2021)......................................................................................14

*Perkins v. New York Times Co.*,
    No. 22-cv-5202 (PKC), 2023 WL 3601489 (S.D.N.Y. May 23, 2023)...................................10

*Oberstein v. Live Nation Ent.*,
    60 F.4th 505 (9th Cir. 2023) ...................................................................................16

*Rutter v. Apple, Inc.*,
    No. 21-cv-04077-HSG, 2022 WL 1443336 (N.D. Cal. May 6, 2022) ...................11

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011).............................................................................................21

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001) ..............................................................................13

*Tanzin v. Tanvir*,
    592 U.S. 43 (2020)..............................................................................................17

*In re Tudor Assocs., Ltd., II*,
    20 F.3d 115 (4th Cir. 1994) ................................................................................23

*United States v. Hansen*,
    599 U.S. 762 (2023).......................................................................................20, 22

*United States v. Ritchie*,
    342 F.3d 903 (9th Cir. 2003) ................................................................................8

*United States v. Smith*,
    7 Fed. App'x 772 (9th Cir. 2001) ........................................................................23

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982).............................................................................................21

*In re Vistaprint Corp Mktg. & Sales Pracs. Litig.*,
    No. 4:08-md-1994, 2009 WL 2884727 (S.D. Tex. Aug. 31, 2009), *aff'd*, 392 Fed.
    App'x 327 (5th Cir. 2010) ...................................................................................11

*Viveros v. Audible Inc.*,
    No. C23-0925JLR, 2023 WL 6960281 (W.D. Wash. Oct. 20, 2023)...............10, 14

*Walker v. Fred Meyer, Inc.*,
    953 F.3d 1082 (9th Cir. 2020) .........................................................................7, 10

*Walkingeagle v. Google LLC*,
    No. 3:22-cv-00763-MO, 2023 WL 3981334 (D. Or. June 12, 2023) .....................10

*Wilder v. Va. Hosp. Ass'n*,
    496 U.S. 498 (1990)............................................................................................17

**Statutes & Regulations**

15 U.S.C. § 45(m)(1)(A) ...................................................................................22

15 U.S.C. § 8401(3)–(4) .....................................................................................7

15 U.S.C. § 8403 .....................................................................................7, 8, 9, 16

15 U.S.C. § 8403(1) ...........................................................................................10

15 U.S.C. § 8403(2) ...........................................................................................16

16 C.F.R. § 310.2(w) ........................................................................................7, 9

42 U.S.C. § 7412(i)(6)(A) .................................................................................18

**Other Authorities**

84 Fed. Reg. 52,396 (Oct. 2, 2019) ....................................................................8

86 Fed. Reg. 60,822 (Nov. 4, 2021) ..........................................................18, 19

88 Fed. Reg. 24,718 (Apr. 24, 2023) ...............................................8, 19, 21, 23

American Heritage Dictionary of the English Language (online ed. 2024) ...........................17, 18

Complaint, *FTC v. DirecTV*,
   No. 4:15-cv-01129 (N.D. Cal. Mar. 11, 2015) ..........................................20

FTC, *Dot Com Disclosures* (May 2000),
   https://tinyurl.com/2r7xx5z5 ...................................................... *passim*

Merriam Webster's College Dictionary (11 ed. 2011) ....................................17

S. Rep. No. 111-240 (2010) .......................................................................1, 18

# INTRODUCTION

The Department of Justice is suing Adobe and two of its executives over customer-friendly subscription practices that make Adobe's creative tools available to more customers, at lower prices, and on more flexible terms. For over 40 years, Adobe's groundbreaking technology has empowered consumers to bring their imaginative creations to life. With household names like Acrobat, Photoshop, and Illustrator, Adobe's software tools have democratized content creation, allowing creative professionals and small businesses to compete on a level playing field with giant corporations. When Adobe pioneered the shift to a subscription services model a dozen years ago, the result was software that was more valuable, versatile, secure, and accessible to a wider range of customers at a lower cost. Adobe's subscription practices are also customer friendly: Adobe offers significant discounts for longer-term subscriptions, provides an online cancellation process that takes about a minute to complete, and offers live phone and chat to help resolve any customer issues. The fact that Adobe has rapidly expanded its customer base in the past few decades is not by accident—it is by design, because satisfied customers make successful businesses.

Notwithstanding that Adobe's subscription model is long-standing and has complied with all existing laws and guidance, the FTC and DOJ seek to use this case to rewrite existing law and retroactively impose their own preferences for how the software industry interacts with its customers. The government's vehicle for claiming that Adobe's industry-standard practices are illegal is a law known as the Restore Online Shoppers' Confidence Act (ROSCA). ROSCA requires online merchants that effect transactions through "negative options" to "clearly and conspicuously disclose" material terms and to provide "simple mechanisms" for cancellation. But the statute was never intended to prohibit standard practices "used by most legitimate e-commerce companies selling goods and services through negative option sales." S. Rep. No. 111-240, at 3 (2010). Instead, ROSCA was intended to prevent fly-by-night online businesses from surreptitiously enrolling customers in subscriptions that they did not want and could not cancel. The government's complaint fails to state a claim for four separate reasons.

*First*, the complaint fails to adequately allege that Adobe sells its software through a negative option that is subject to ROSCA. ROSCA applies only to transactions "effected" through a "negative

1

1  option"—that is, transactions where a merchant interprets a customer's failure to take affirmative

2  action as the customer's consent to the subscription. But the complaint never alleges that Adobe

3  interprets customers' silence as consent for the subscription, and the images in the complaint show

4  that Adobe's customers actually provide their affirmative consent to sign up for Adobe's software

5  subscriptions by selecting the annual or monthly plan that they prefer.

6    ***Second***, even if the complaint adequately alleged that Adobe uses negative options, the

7  government has not plausibly alleged that Adobe failed to clearly and conspicuously disclose certain

8  details of one of its subscription plans, known as the "Annual, paid monthly" plan. The government

9  asserts that this plan is illegal because customers do not understand that an "*Annual*, paid monthly"

10  contract is an *annual* contract and that cancelling the contract may trigger a fee, even though the

11  contract's sign-up page expressly states that it is an "Annual" plan and that a "[f]ee applies if you

12  cancel after 14 days." (Screenshot, Compl. ¶ 36).

13
14
15     Annual, paid monthly
16     **US$54.99/mo**
17     *Fee applies if you cancel after 14 days.* ⓘ

18    Similarly, the government claims that Adobe failed to disclose the methodology for

19  calculating the early cancellation fee, notwithstanding that Adobe disclosed the cancellation

20  methodology through a conspicuous "Cancellation Terms" hyperlink—a disclosure method that FTC

21  guidance and courts have expressly sanctioned. The very screenshots the complaint incorporates

22  make clear that Adobe clearly and conspicuously disclosed the material terms of its "Annual, paid

23  monthly" subscription.

24    ***Third***, the government claims that Adobe's cancellation processes are not "simple," even

25  though customers can easily and quickly complete Adobe's online cancellation flow—or cancel by

26  contacting customer service via phone or webchat. The government attacks these cancellation

27  mechanisms because they contain "additional" steps, including "save offers." But the law does not

28  prohibit additional steps or save offers. In fact, the FTC's own guidance has authorized such steps,

2

Defendants' Notice of Motion and Motion to Dismiss Complaint; Memorandum of Points & Authorities
CASE NO. 5:24-CV-3630-BLF

1  as long as they do not cause "undue delay." The only "law" that would prohibit additional

2  cancellation steps is a new rule that the FTC recently proposed, but has so far been unable to

3  promulgate, known as the "click-to-cancel rule." But this regulatory *proposal* proves that existing

4  law does *not* require a one-step cancellation process. And interpreting ROSCA to require a one-step

5  cancellation process would violate the Due Process Clause and the First Amendment. The Court

6  should reject the government's request that it adopt such a constitutionally—and textually—

7  impermissible interpretation of ROSCA.

8      ***Fourth***, even if the government's novel theory of ROSCA liability can proceed, the Court

9  should still dismiss the government's demand for civil penalties. Civil penalties are available only if

10  Adobe *knew* or *had reason to know* that its conduct was unlawful. But the government's allegations

11  of scienter fall far short of plausibly showing that Adobe anticipated—and accepted—the

12  government's implausible and constitutionally problematic theories of ROSCA liability. The notion

13  that Adobe knowingly violated ROSCA—when the FTC itself has said the statute is unclear—is

14  unfounded. Indeed, the government's assertion that Adobe had such knowledge is based almost

15  entirely on the allegation that Adobe is a large company and has lawyers. Those allegations fall far

16  short of establishing the knowledge necessary for civil penalties.

17                              **BACKGROUND**

18      **A.    Adobe's Subscription Services**

19      Adobe offers its popular software—"including [the] flagship applications Acrobat,

20  Photoshop, Illustrator, and Creative Cloud"—on a subscription basis. Compl. ¶¶ 1, 23–26. To make

21  these creative tools accessible to a wide array of consumers, Adobe provides three different pricing

22  plans: "Monthly"; "Annual, prepaid"; and "Annual, paid monthly." *Id.* ¶ 27. As reflected in the

23  complaint, each plan type has a different pricing structure:

24      • Monthly: The "Monthly" plan is an undiscounted month-to-month contract, which

25          customers can cancel any time, for no fee.

26      • Annual, prepaid: The "Annual, Prepaid" plan requires an annual commitment, but it

27          gives customers a significant discount from the "Monthly" plan, in exchange for

28          customers agreeing to a yearly contract and paying the entire contract price up front.

3

1      • <u>Annual, paid monthly:</u> Adobe also offers a third, hybrid option:  the "Annual, paid

2         monthly" plan. It offers customers nearly the same discount as the "Annual, prepaid"

3         plan, but customers can pay their annual commitment in monthly installments.

4         Despite the plan's annual commitment, customers can cancel during the first year by

5         paying a cancellation fee of 50 percent of the remaining monthly installments. After

6         the first year, customers can cancel the "Annual, paid monthly" plan at any time

7         without a fee, while keeping the discounted monthly price forever.

8      Adobe provides information about its different plans through an online enrollment process.[1]

9   First, there is the "Plan Selection Page":



22  (Screenshot, Compl. ¶ 36). On this page, the customer confirms their application selection (*i.e.*,

23  "Creative Cloud All Apps") on the left-hand side of the screen. Then on the right-hand side of the

24  screen, the customer selects the subscription payment plan they want. The first option is "**Annual**,

[1] The government cites and includes screenshots from the online enrollment process in its complaint,
and therefore it is incorporated by reference. For the court's convenience, Defendants have attached
the entirety of that online enrollment process as Exhibit 1 to this motion to dismiss.

4

paid monthly." (emphasis added). Adobe discloses that, for this "Annual, paid monthly" plan, a "*Fee applies if you cancel after 14 days*." By contrast, the "Annual, prepaid" plan has "*No refund if you cancel after 14 days*" and the "Monthly" plan permits customers to "*Cancel anytime, no fee.*" The fact that the "Annual, paid monthly" plan is an *annual* subscription is disclosed in the name of the plan and by the fact that there is a "fee" if you "cancel" early.

Once customers choose the "Annual, paid monthly" plan and click the "Continue" button, they are taken to a "Payment Entry Page," which includes the following disclosure:

> By clicking "Agree and subscribe", you agree: **After your trial ends, you will be charged US$54.99 (plus tax) monthly. At the end of your one-year term, your subscription will automatically renew monthly until you cancel (price subject to change). Cancel before your trial ends and you won't be charged. No annual commitment required after the first year. Cancel anytime via Adobe Account or Customer Support.** Cancel before May 29, 2023 to get a full refund and avoid a fee. You also agree to the Terms of Use and the Subscription and Cancellation Terms.
>
> Agree and subscribe

(Screenshot, Compl. ¶ 47). This disclosure states that customers are signing up for a plan with a "one-year term"—and that they must cancel by a specific date to "avoid a fee." The disclosure also makes clear that there is "[n]o annual commitment required after the first year."

Adobe's disclosure also includes its "Subscription and Cancellation Terms" in a blue-font hyperlink. That hyperlink provides a detailed description of how the early cancellation fee is calculated: "Should you cancel after 14 days, you'll be charged a lump sum amount of 50% of your remaining contract obligation and your service will continue until the end of that month's billing period." *See* Compl. ¶ 51. To purchase a subscription, customers must first enter their payment information and confirm that they "agree to [these] . . . Subscription and Cancellation Terms."

The complaint insinuates that the early cancellation fee makes the "Annual, paid monthly" plan a bad deal for customers. That is wrong. Without the fee, there would be no meaningful difference between the "Monthly" and "Annual, paid monthly" options to justify offering the latter plan's discounted monthly price. Annual commitments with early cancellation consequences are commonplace in everyday life, such as with car and apartment leases. Reasonable customers would

not be surprised to learn from Adobe's disclosures that a fee applies for terminating a discounted annual subscription before the end of the annual term. Adobe's disclosures allow customers to choose the plan that will maximize their benefits.

Which plan makes the most financial sense for a given customer depends on how long the customer plans to use a given application. A customer who wants the subscription for a relatively short time—*e.g.*, for a single project—may be better off with the month-to-month "Monthly" plan. But even using an application for just six months makes the "Annual, paid monthly" plan (including its early cancellation fee) less expensive than the "Monthly" plan even if the "Annual, paid monthly" customer breaks their annual commitment. As shown by the chart below, a customer who cancels her "Creative Cloud All Apps" subscription after just six months would pay slightly less money ($494.91) under the "Annual, paid monthly" plan (including the early cancellation fee) than under the "Monthly" plan ($494.94).



And as the chart illustrates, customers who use the product for more than six months obtain even greater savings through the "Annual, paid monthly" plan. The plan is thus the best option for many committed customers.

## B.    Adobe's Cancellation Mechanisms

Adobe provides three ways for customers to cancel their subscriptions, including online self-cancellation, contacting customer service via online chat, and contacting customer service by phone.

6

1  Compl. ¶ 77. During the cancellation process, Adobe typically will (i) ask why customers are

2  cancelling, (ii) explain the consequences of cancellation (*e.g.*, losing access to projects stored

3  through Adobe's tools), and (iii) offer a discount for customers willing to remain subscribers. *Id.*

4  ¶¶ 101, 107, 109, 112, 116, 131, 143. These steps in the cancellation process provide customers with

5  critical information about cancellation and offer alternative options to cancellation (such as changing

6  subscriptions), which many customers choose. In addition, informing customers about the impact of

7  cancelling is important and necessary because many of Adobe's customers store vital work projects

8  and family photos through Adobe's tools. But in all events, Adobe's customers can and do cancel

9  simply and easily.

10       **C.      ROSCA and FTC Guidance**

11       Congress enacted ROSCA in 2010 to combat "aggressive sales tactics" used to enroll

12  customers in subscriptions that they "did not want." 15 U.S.C. § 8401(3)–(4). ROSCA applies to

13  companies that "charge any consumer for any goods or services sold in a transaction effected on the

14  Internet through a negative option feature," *id.* § 8403, which "means, in an offer or agreement to

15  sell or provide any goods or services, a provision under which the customer's silence or failure to

16  take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the

17  seller as acceptance of the offer," 16 C.F.R. § 310.2(w). Negative option sellers must: (1) "clearly

18  and conspicuously" disclose all material terms of the transaction; (2) obtain "express informed

19  consent" before charging a customer; and (3) provide "simple mechanisms" for cancelling recurring

20  charges. 15 U.S.C. § 8403.

21       ROSCA defines none of these requirements. But the statute was enacted against the backdrop

22  of longstanding FTC guidance setting out rules that online merchants can follow to make "clear and

23  conspicuous" disclosures. *See* FTC, *Dot Com Disclosures*, at 1 (May 2000) ("*Dot Com*

24  *Disclosures*"), https://tinyurl.com/2r7xx5z5. And the "clear and conspicuous" standard is well

25  accepted in the law. *See, e.g.*, *Walker v. Fred Meyer, Inc.*, 953 F.3d 1082, 1091 (9th Cir. 2020). By

26  contrast, no pre-ROSCA guidance or caselaw elucidates ROSCA's "simple mechanisms"

27  requirement. The agency has repeatedly conceded that this standard "lacks specificity about

28  cancellation procedures" and "requires marketers to provide 'simple mechanisms' for the consumer

7

1  to stop recurring charges *without guidance about what is simple*." *Negative Option Rule*, 88 Fed.

2  Reg. 24,716, 24,718 (Apr. 24, 2023) (emphasis added); *see also Rule Concerning the Use of*

3  *Prenotification Negative Option Plans*, 84 Fed. Reg. 52,393, 52,396 (Oct. 2, 2019) (ROSCA "does

4  not specify what methods would satisfy" the "simple mechanisms" standard).

5          In April 2023, the FTC proposed a new rule regarding negative options to remedy the

6  ambiguity of ROSCA's "simple mechanism" standard. That rule would impose new and specific

7  requirements under Section 5 of the FTC Act. 88 Fed. Reg. at 24,718. The proposed rule, which

8  would only apply prospectively, would require that negative option sellers allow customers to

9  "immediately" cancel subscriptions and would prohibit attempts to persuade customers to remain

10 subscribers through discounts or other "save" offers. *Id.* at 24,735 (§ 425.6). The rule has not been

11 finalized or promulgated.

12                                      **LEGAL STANDARD**

13         To survive a motion to dismiss, a complaint must allege "enough facts to state a claim to

14 relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). "A claim

15 has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

16 reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556

17 U.S. 662, 678 (2009). In conducting this analysis, the Court must accept all well-pleaded factual

18 allegations as true. *See id.* But the Court need not accept "legal conclusion[s] couched as . . . factual

19 allegation[s]." *Twombly*, 550 U.S. at 555. And the Court need not accept allegations that contradict

20 documents (i) incorporated into the complaint or (ii) properly subject to judicial notice (*e.g.*, Federal

21 Register notices or agency guidance). *See Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112,

22 1115 (9th Cir. 2014); *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

23                                         **ARGUMENT**

24 **I.    The Complaint Fails to Adequately Allege That Adobe Sells Negative Options Subject**

25 **To ROSCA.**

26         ROSCA applies only to "transaction[s] effected on the Internet through a negative option

27 feature." *See* 15 U.S.C. § 8403. A "[n]egative option feature means, in an offer or agreement to sell

28 or provide any goods or services, a provision under which the customer's silence or failure to take an

                                                   8

1  affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as

2  acceptance of the offer." *See* 16 C.F.R. § 310.2(w) (emphasis omitted).

3        The complaint fails to allege facts showing that any specific Adobe transaction was

4  "effected" through interpreting silence as "acceptance of the offer." In fact, the example purchase

5  flow screenshots included in the complaint show that far from effecting a transaction through

6  silence, Adobe asks its customers to select one of three pricing plans for their subscriptions:

7  "Annual, prepaid," "Annual, paid monthly," or "Monthly." *See* Compl. ¶ 36, 47. Only after the

8  customer selects one of the paid plans, can it be enrolled. *Id.* Thus, the allegations demonstrate that

9  Adobe effects the transaction through affirmative consent, not interpreting silence as consent.

10       The complaint even concedes that many customers purchase Adobe subscriptions through the

11  "buy now" option, meaning there is no free trial component. Compl. ¶ 33. In these circumstances,

12  where a customer begins a subscription immediately upon purchase, there is no way even to suggest

13  that the "transaction" is "effected . . . through a negative option feature." 15 U.S.C. § 8403. Put

14  differently, the customer's affirmative consent to purchase the "Annual, paid monthly" subscription

15  is not based on silence—it is affirmatively given.

16       The complaint's efforts to undermine these facts are mere conclusory allegations that

17  Adobe's subscription plans are "negative option features." *See* Compl. ¶ 119 ("Defendants offer

18  consumers negative option features as defined by ROSCA, including in subscriptions for products

19  and services including the monthly, annual paid monthly, annual billed monthly, yearly billed

20  monthly, yearly paid monthly, annual prepaid, yearly paid upfront, annual paid upfront, and yearly

21  billed upfront plans."). But legal conclusions are not sufficient to state a claim, and they certainly

22  cannot overcome the existence of the "buy now" option and the complaint's own screenshots, which

23  show customers are enrolled only when they select one of three plans. The Court should reject the

24  government's attempt to apply ROSCA far more broadly than Congress intended.

25  **II.    The Court Should Dismiss Counts I and II.**

26       The complaint does not plausibly allege that Adobe failed to clearly and conspicuously

27  disclose: (1) the annual commitment for the "Annual, paid monthly" plan, (2) the existence of an

28  early cancellation fee, and (3) the methodology for calculating that fee. Based on a facial review of

9

1   the disclosures, Adobe's online enrollment flow provides clear and conspicuous information about

2   all three of these terms, and on that basis, the Court should dismiss Counts I and II.

3       **A.    Adobe "clearly and conspicuously" disclosed the material terms of its "Annual,**

4           **paid monthly" plan.**

5       ROSCA requires that the material terms of a negative option transaction be "clearly and

6   conspicuously disclose[d]." 15 U.S.C. § 8403(1). This means that disclosures must be "reasonably

7   understandable" (*i.e.*, "clear") and "readily noticeable" (*i.e.*, "conspicuous"), *see Walker*, 953 F.3d at

8   1091, to a "*reasonable*" consumer, *see Barrer v. Chase Bank USA, N.A.*, 566 F.3d 883, 892 (9th Cir.

9   2009); *see also FTC v. Amazon.com, Inc.*, No. 2:23-cv-00932-JHC, 2024 WL 2723812 (W.D. Wash.

10  May 28, 2024). It is insufficient to allege that a disclosure "might conceivably be misunderstood by

11  some few consumers viewing it in an unreasonable manner." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965

12  (9th Cir. 2016). Instead, a disclosure fails the "reasonable consumer" standard only if it is "*likely*

13  mislead consumers acting reasonably under the circumstances." *FTC v. Stefanchik*, 559 F.3d 924,

14  928–29 (9th Cir. 2009) (emphasis added). In determining whether a disclosure satisfies ROSCA, the

15  FTC's pre-ROSCA *Dot Com Disclosures* guidance—the legal backdrop against which Congress

16  acted—is also highly probative. *See George v. McDonough*, 596 U.S. 740, 746 (2022).

17      A court can—and should—dismiss a complaint when the adequacy of disclosures is obvious.

18  *See, e.g.*, *Gershfeld v. TeamViewer US, Inc.*, No. 21-55753, 2023 WL 334015, at *1 (9th Cir. Jan.

19  20, 2023) (affirming dismissal where disclosures incorporated into the complaint established that

20  terms "were presented in a clear and conspicuous manner"); *Hall v. Time, Inc.*, 857 Fed. App'x. 385,

21  386 (9th Cir. May 24, 2021) (same). Where a facial review shows that the required disclosures *were*

22  "clear and conspicuous," *Walkingeagle v. Google LLC*, No. 3:22-cv-00763-MO, 2023 WL 3981334,

23  at *5 (D. Or. June 12, 2023), or where the complaint "does not plausibly allege why . . . [the

24  disclosures] would not be obvious or plainly visible to a consumer," *Perkins v. New York Times Co.*,

25  No. 22-cv-5202 (PKC), 2023 WL 3601489, at *4 (S.D.N.Y. May 23, 2023), a court must dismiss the

26  complaint, *see Viveros v. Audible Inc.*, No. C23-0925JLR, 2023 WL 6960281, at *8 (W.D. Wash.

27  Oct. 20, 2023); *compare with FTC v. LendingClub Corp.*, No. 18-CV-02454-JSC, 2020 WL

28

2838827, at *22 (N.D. Cal. June 1, 2020) (extrinsic evidence, like a consumer survey, is needed when disclosures are not clear on their face).

### 1. Adobe clearly and conspicuously disclosed that its "Annual, paid monthly" plan was an annual plan.

The government first alleges that Adobe "fail[ed] to clearly and conspicuously disclose . . .  that the length of the ["Annual, paid monthly"] subscription term is one year." *See* Compl. ¶¶ 34, 42. To state this allegation is to refute it. The subscription's annual term is plainly obvious to a reasonable consumer—the word "Annual" is in the *name* of the subscription that customers select. And it is the first and most prominent word in that name:

> Annual, paid monthly
>
> **US\$54.99/mo**
>
> *Fee applies if you cancel after 14 days.* ⓘ

(Screenshot, Compl. ¶ 36). No consumer would fail to understand that the "Annual, paid monthly" subscription was, in fact, an *annual* subscription, *see Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 509 (6th Cir. 2013) (adequacy of disclosure does not turn on "the most obtuse consumer"), unless the consumer "decline[d] to read [the] clear and easily understandable" *name* of the subscription they elected, *In re Vistaprint Corp Mktg. & Sales Pracs. Litig.*, No. 4:08-md-1994, 2009 WL 2884727, at *6 (S.D. Tex. Aug. 31, 2009), *aff'd*, 392 Fed. App'x 327 (5th Cir. 2010). But that consumer would not be a "*reasonable*" one. *Rutter v. Apple, Inc.*, No. 21-cv-04077-HSG, 2022 WL 1443336, at *8 (N.D. Cal. May 6, 2022) (emphasis added). A reasonable consumer cannot be "selectively blind" to the name of the plan they are choosing. *Hodges v. King's Hawaiian Bakery W., Inc.*, 2021 WL 5178826, at *7 (N.D. Cal. Nov. 8, 2021).

Here, moreover, Adobe repeated the subscription name as either an "Annual" or "Yearly" plan on each page of the enrollment flow and provided a bolded disclosure that the "Annual, paid monthly" subscriptions would "automatically renew monthly" after "the end of your *one-year term*." Compl. ¶¶ 47–48 (emphasis added). Adobe also specified that "[n]o annual commitment [would be]

11

required *after the first year*," *id.* (emphasis added), making the "annual commitment" that much harder for reasonable consumers to miss, *see Dot Com Disclosures* at 13 ("*Repeating* a disclosure makes it more likely that a consumer will notice and understand it." (emphasis added)).

### 2. Adobe clearly and conspicuously disclosed the early cancellation fee.

A similar facial analysis refutes the government's separate theory that Adobe failed to "clearly and conspicuously disclose . . . that cancellation before the end of the first year is subject to an" early cancellation fee. Compl. ¶ 34.

As with the annual commitment, the existence of a cancellation fee appears on the Plan Selection Page, which is the first advertising page, directly below the monthly price for the "Annual, paid monthly" subscription. *See Heinz v. Amazon.com, Inc.*, No. 2:23-cv-00282 WBS AC, 2023 WL 4466904, at *2 (E.D. Cal. July 11, 2023) (terms were "conspicuous" where they were "contained in language directly below" confirmation button). (Screenshot, Compl. ¶ 36).

Annual, paid monthly

**US$54.99/mo**

*Fee applies if you cancel after 14 days.* ⓘ

This disclosure can be read and understood by any reasonable consumer, and it plainly complies with the pre-ROSCA guidance's placement and proximity requirements. *See Dot Com Disclosures* at 6 ("[a] disclosure is more effective if it is placed near the claim it qualifies"). Likewise, the disclosure of the fee was stated in simple and straightforward language—"*Fee applies if you cancel after 14 days*," Compl. ¶ 38—which complies with the requirement that disclosures "use clear language and syntax and avoid legalese or technical jargon." *Dot Com Disclosures* at 14.

The government asserts that this disclosure was made "in less prominent text." *See* Compl. ¶ 42. But the law does not require that disclosures be displayed in the "most prominent" text. And a facial review of the enrollment flow shows that the print of this disclosure is the same size as almost all of the other text on the screen, including the name and description of the subscription service being purchased. *See Dot Com Disclosures* at 12 ("Disclosures that are at least as large as the

12

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT; MEMORANDUM OF POINTS & AUTHORITIES
CASE NO. 5:24-CV-3630-BLF

1    advertising copy are more likely to be effective."); *see also Sprewell v. Golden State Warriors*, 266

2    F.3d 979, 988 (9th Cir. 2001) (a court "need not . . . accept as true allegations that contradict matters

3    properly subject to judicial notice or by exhibit"). What is more, the disclosure of the early

4    cancellation fee is italicized for emphasis and followed by a "tooltip" icon, which, if hovered over,

5    displays the following message: "If you cancel after 14 days, your service will continue until the end

6    of that month's billing period, and you will be charged an early termination fee." Compl. ¶ 39. The

7    early cancellation fee is clearly disclosed even without the tooltip, but the tooltip serves to make the

8    early cancellation fee more prominent and to provide additional information.

9         Examining "all the elements in the ad, not just the text of the disclosure," makes the

10    cancellation fee's existence that much more inescapable. *Dot Com Disclosure* at 13. For example,

11    Adobe's comparison of the different subscription plans highlights the early cancellation fee:



21    (Screenshot, Compl. ¶ 36). In this comparison, the "Monthly" plan has a higher monthly price, along

22    with the benefit that a consumer could "*Cancel anytime, no fee.*" That contrasts with the "Annual,

23    paid monthly" plan's lower price accompanied by the warning that a "*Fee applies if you cancel after*

24    *14 days.*" A reasonable consumer would understand that the "Monthly" plan required a higher

25    monthly payment in exchange for no commitment and therefore "no fee," while the "Annual, paid

26    monthly" plan offered a discounted monthly payment in exchange for an annual commitment and

27    cancellation fee. The disclosures preceding the "Agree and subscribe" button reinforce this point;

28

13

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT; MEMORANDUM OF POINTS & AUTHORITIES
CASE NO. 5:24-CV-3630-BLF

they state that customers must "[c]ancel before [a certain date] to get a full refund and *avoid a fee*." Compl. ¶ 48 (emphasis added).

### 3.    Adobe clearly and conspicuously disclosed the cancellation fee methodology.

The government objects to Adobe's use of a "Subscription and Cancellation Terms" hyperlink to disclose the terms of how the early cancellation fee is calculated. *See id.* ¶ 50. But the FTC's pre-ROSCA guidance expressly permits the use of hyperlinks, including their use to disclose the amount of early cancellation fees. Under that guidance and well-settled Ninth Circuit precedent, Adobe's hyperlinked disclosure passes muster.

The FTC's pre-ROSCA guidance expressly provides that online businesses "may use a clearly-labeled hyperlink" to clearly and conspicuously disclose material information. *See Dot Com Disclosures* at 1–2, 16. The guidance specifically authorizes the use of hyperlinks to provide details about potential "fees," noting that "details about the additional fees might be too complex to describe adjacent to the price claim and may be provided by using a hyperlink." *Id.* at 7 n.23. The pre-ROSCA guidance then illustrates this principle with an example in which the *existence* of an early cancellation fee is disclosed adjacent to the price claim but "the *details* about th[e] additional fe[e]," including the *amount* of the cancellation fee, are "described on the click through page"—that is, behind the hyperlink. *Id.* Ex. 4 (emphasis added). The FTC guidance thus expressly sanctions Adobe's practice of disclosing the amount of its early cancellation fee via hyperlink.

Numerous cases—including many recent cases in this Circuit—have likewise affirmed that hyperlinked disclosures can be clear and conspicuous. *See, e.g.*, *Viveros* at *2, *8 (hyperlink to Audible's "Conditions of Use" clearly and conspicuously disclosed the terms of Audible's "cancellation policy"); *see also Hall v. Time, Inc.*, No. SACV 19-01153-CJC(ADSx), 2020 WL 2303088, at *4 (C.D. Cal. Mar. 13, 2020) (defendants clearly and conspicuously disclosed the required terms where defendants "provided information about how and when [plaintiff] could cancel, with hyperlinks to the relevant contact information"), *aff'd*, 857 F. App'x 385 (9th Cir. 2021); *Morrell v. WW Int'l, Inc.*, 551 F. Supp. 3d 173, 184 (S.D.N.Y. 2021) ("description of the cancellation policy" was clear and conspicuous where it was provided in hyperlinked "Cancellation

14

Policy"). The complaint is incorrect in asserting that hyperlinked disclosures cannot be clear and conspicuous.

Of course, the hyperlinks themselves must still be clear and conspicuous. Under the FTC's pre-ROSCA guidance, Adobe's hyperlink meets this standard. The FTC's pre-ROSCA guidance recommends that businesses: (1) make hyperlinks obvious; (2) label them appropriately; (3) use hyperlink styles consistently; (4) place the hyperlinks near relevant information; and (5) take consumers directly to the disclosure on the click-through page. *See Dot Com Disclosures* at 1–2, 7–9. Or, as the Ninth Circuit has succinctly put it, "while it is permissible to disclose terms and conditions through a hyperlink, the fact that a hyperlink is present must be readily apparent." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022).

Adobe's "Subscription and Cancellation Terms" hyperlink plainly complies with these instructions. (Screenshot, Compl. ¶ 47).

By clicking "Agree and subscribe", you agree: **After your trial ends, you will be charged US$54.99 (plus tax) monthly. At the end of your one-year term, your subscription will automatically renew monthly until you cancel (price subject to change). Cancel before your trial ends and you won't be charged. No annual commitment required after the first year. Cancel anytime via Adobe Account or** Customer Support. Cancel before May 29, 2023 to get a full refund and avoid a fee. You also agree to the Terms of Use and the Subscription and Cancellation Terms.

Agree and subscribe

The hyperlink is "obvious," using blue font consistent with Adobe's other hyperlinks. It is labeled appropriately, making clear that the link leads to more information about how "Cancellation" works. It comes directly after notice that consumers must "[c]ancel before" a specific date "to get a full refund and avoid a fee," underscoring that the link leads to information about the *fee* that may result from *cancellation.* And the hyperlink takes consumers directly to the relevant disclosure, which is set out in simple, straightforward language: "Should you cancel after 14 days, you'll be charged a lump sum amount of 50% of your remaining contract obligation[.]" Compl. ¶ 51.

The context of Adobe's hyperlinked disclosure also increases the likelihood that it would have been noticed and understood by a reasonable consumer. Consumers know that they are purchasing a *subscription* for an Adobe application, and they know the subscription comes with an early cancellation fee. Because they "contemplate . . . [this] continuing relationship" with Adobe, consumers are more likely to "scrutinize [Adobe's website] for" disclosures relevant to the cancellation fee. *See Oberstein v. Live Nation Ent.*, 60 F.4th 505, 516–17 (9th Cir. 2023). By the same token, consumers who are interested in how the fee is calculated are likely to look "for a link to the terms of that" cancellation fee. *See Chabolla v. ClassPass Inc.*, No. 4:23-CV-00429-YGR, 2023 WL 4544598, at *6 (N.D. Cal. June 22, 2023).

### B.  Adobe satisfied ROSCA's informed consent requirement.

ROSCA requires sellers to obtain consent that is express and informed. 15 U.S.C. § 8403(2). Count II's allegation that Adobe violated this requirement rests on the assertion that Adobe failed to clearly and conspicuously disclose material terms. *See FTC v. Health Formulas*, 2015 WL 2130504, at *17 (D. Nev. May 6, 2015) (disclosures that are not "clear and conspicuous" "cannot serve as the basis for customers' express, informed consent"). Therefore, because the complaint does *not* plausibly allege a violation of ROSCA's clear and conspicuous requirement, Count II fails alongside Count I.

### III.  The Court Should Dismiss Count III.

To state a claim for Count III, the complaint must plausibly allege facts showing that Adobe's cancellation processes are not "simple mechanisms." 15 U.S.C. § 8403. Under the ordinary and plain meaning of ROSCA's "simple mechanisms" requirement, however, the complaint fails to state a claim. Instead, the complaint attempts to change the meaning of "simple" and impose a "one click" cancellation requirement that would prohibit merchants from trying to persuade customers to remain subscribers. That is not the legal standard under ROSCA. The only law that would require one-click cancellation (with no additional steps) is a rule the FTC has proposed but not yet promulgated. But the FTC cannot enforce a non-yet-promulgated rule retroactively. And interpreting ROSCA to demand one-step cancellation would run headlong into the Due Process Clause and the First Amendment.

**A.     ROSCA's "simple mechanisms" requirement.**

Because ROSCA does not define "simple mechanisms," the statute's "plain meaning at the time of enactment" controls. *See Tanzin v. Tanvir*, 592 U.S. 43, 46–48 (2020). The ordinary meaning of the word "simple" is "readily understood or performed." Merriam Webster's College Dictionary (11 ed. 2011). "Simple" also requires the absence of deceit: "Not . . . guileful, or deceitful." *See* The American Heritage Dictionary of the English Language (online ed. 2024). The ordinary meaning of the word "mechanism" is "a process . . . by which something is done." *Id.* Thus, by its plain terms, ROSCA requires a cancellation "process" that is "readily understood or performed" and "not deceitful." It does not require one-step cancellation or prohibit additional steps.

ROSCA's standard is also *objective*, not *subjective*. The word "simple" is a term of degree that requires an "objective benchmark" to provide courts with an "enforceable" standard, *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 519 (1990), and the "reasonable person" standard supplies this benchmark, *see, e.g.*, *Barrer*, 566 F.3d at 892 (applying "reasonable cardholder" test); *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 704 (2d Cir. 2023) (analyzing whether "[a] reasonably prudent internet or smartphone user" would have noticed). Consequently, the government must plausibly allege that "a significant portion . . . of targeted consumers"—*i.e.*, Adobe customers—"acting reasonably in the circumstances," *Ebner*, 838 F.3d at 965, were deceived by Adobe's cancellation processes or were unable to "readily understand and perform" those processes. The government's allegations do not come close to this standard, as properly defined.

**B.     The complaint does not plausibly allege that Adobe's cancellation mechanisms violate ROSCA.**

> **1.     The complaint does not plead facts showing that Adobe's online cancellation flow was not a "simple mechanism."**

Tellingly, the government decided not to include any screenshots from Adobe's online cancellation flow that would allow the Court to assess whether the process is facially simple.[2]

---

[2] To facilitate the Court's review, Adobe's online cancellation flow—which is referred to and incorporated by reference in the complaint—is attached as Exhibit 2.

1    Regardless, the complaint also fails to plead facts showing that Adobe's cancellation flow flunks

2    ROSCA's "simple" standard. Specifically, the complaint does not allege that the cancellation flow:

3          • cannot be readily performed;

4          • cannot be readily understood; or

5          • is deceptive.

6          The complaint also fails to allege that a single reasonable Adobe customer—let alone a

7    significant portion of those customers—(i) was unable to find the cancellation flow; (ii) was unable

8    to understand the flow; (iii) was unable to complete the flow in a reasonable amount of time;

9    (iv) was deceived by the flow; or (v) found the flow overly complicated. In fact, over time, Adobe's

10   cancellation flow has gotten more simple.

11         The complaint's *factual* allegations boil down to two points: first, that the self-cancellation

12   flow has steps that are "unnecessary to honor consumers' cancellation requests;" and, second, that

13   those steps are "designed to promote retention" by persuading customers to keep their subscriptions.

14   Compl. ¶ 80.

15         But neither of these allegations pleads a violation of the statute. ROSCA does not prohibit so-

16   called *additional* steps or retention efforts. In fact, the word "mechanisms"—which denotes "[t]he

17   arrangement of connected *parts* in a machine"—makes clear that multiple steps in a process are

18   permitted. *See* The American Heritage Dictionary of the English Language (emphasis added). This

19   reading of the plain text is confirmed by the FTC's own guidance, which confirms that additional

20   steps like "save offers" are permissible so long as they do not impose "unreasonable delay." *See* 86

21   Fed. Reg. 60,822, 60,826 n.48 (Nov. 4, 2021) (noting that a "request to consider an offer or discount

22   would not amount to an unreasonable delay"). ROSCA's legislative history similarly confirms that

23   the statute was not intended to prohibit the standard practices "used by most legitimate e-commerce

24   companies," which, of course, would have included multiple steps and reasonable retention efforts.

25   S. Rep. No. 111-240, at 3. Congress could have imposed a "*simplest* mechanism" (*i.e.*, one-step

26   cancellation) requirement, but it chose not to do so. *Cf.* 42 U.S.C. § 7412(i)(6)(A) (requiring the

27   "*best* available control technology" (emphasis added)).

28         Confirming this reading of the statute, the FTC has proposed (but not yet promulgated) a rule

18

1  that would require one-step cancellation mechanisms to "immediately stop any recurring charges."

2  *See* 88 Fed. Reg. at 24,735 (§ 425.6(a)); *see also id.* at 24,735–36 ("The seller must immediately

3  cancel the negative option feature upon request from a consumer[.]") (§ 425.6(d)); *id.* at 24,728

4  (referring to § 425.6 as the "'Click to Cancel' provision"). The fact that the FTC has proposed a new

5  rule to require one-step cancellation proves that existing law does not already require it. In fact, the

6  FTC has defended the new rule on the ground that existing law "lacks specificity about cancellation

7  procedures" and fails to provide "*guidance about what is simple.*" 88 Fed. Reg. at 24,718 (emphasis

8  added)). Now the government suggests that law is clear. The government cannot have it both ways,

9  and it cannot retroactively impose a not-yet-promulgated rule.

10         **2.**    **The complaint fails to plead that Adobe's phone and chat processes were**

11                **not "simple mechanisms."**

12       The complaint's allegations regarding Adobe's other cancellation mechanisms fare no better.

13 The government claims that these cancellation methods involve "retention tactics . . . similar to those

14 that users experience when trying to self-cancel online," and the complaint criticizes customer-

15 service personnel for asking "subscribers to provide a reason for cancelling" and for offering

16 customers "several free months" instead of immediately cancelling. Compl. ¶¶ 89, 93–95. But as just

17 explained, none of that violates existing law. Nor do the other cancellation "obstacles" the complaint

18 alleges plausibly suggest ROSCA violations.

19       For example, the complaint alleges that "customer service is wholly unavailable to individual

20 consumers between Friday and Sunday evenings." Compl. ¶ 90(a). But ROSCA does not require

21 online merchants to maintain a 24/7 cancellation hotline. Even the government agrees: agency

22 guidance specifies that telephonic cancellation need only operate "during normal business hours," as

23 Adobe's does. *See* 86 Fed. Reg. at 60,826.

24       As for the allegation that "subscribers have had their calls or chats either dropped or

25 disconnected," the complaint does not plausibly suggest that *Adobe* somehow caused those dropped

26 or disconnected calls. Compl. ¶ 90(b); *see also Twombly*, 550 U.S. at 545 (emphasizing the "need at

27 the pleading stage for allegations plausibly suggesting (not merely consistent with)" illegality).

28 ROSCA does not make businesses responsible for customers' poor internet and mobile phone

connections. The complaint at one point alleges that "numerous subscribers attempting to cancel via phone have been subject to calls lasting upwards of 20 or 30 minutes." Compl. ¶ 96. But, again, the complaint does not allege that these delays were the result of Adobe's overly complicated cancellation mechanisms as opposed to unusually high call volumes, customer connectivity issues, or other issues beyond Adobe's control.

The complaint only alleges that "numerous" consumers have complained about Adobe's cancellation methods, and it cites several anonymous examples. *See id.* ¶ 106. But Adobe has had tens of millions of customers. The fact that the FTC can only allege that there were "numerous complaints" out of tens of millions of customers actually suggests that there is no problem here. *See FTC v. Am. Future Sys., Inc.*, No. CV 20-2266, 2024 WL 1376026, at *21 (E.D. Pa. Mar. 29, 2024) ("As with any business, some customer complaints are expected."). Indeed, in other cases where the government *lost* on similar allegations, it identified "tens of thousands" of consumer complaints about the conduct at issue. *Cf.* Compl. ¶ 15, *FTC v. DirecTV*, No. 4:15-cv-01129 (N.D. Cal. Mar. 11, 2015) ("Defendants' marketing practices have been the focus of tens of thousands of consumer complaints and of actions by the attorneys general of all 50 states and the District of Columbia.").

### 3. The Constitution prevents interpreting ROSCA to require one-step cancellation or prohibit retention efforts.

Even if it were possible to interpret the "simple mechanisms" standard as requiring one-step cancellation and prohibiting retention efforts as the government suggests, the Due Process Clause and the First Amendment would forbid reading the statute so broadly and atextually. *See United States v. Hansen*, 599 U.S. 762, 781 (2023) (when an interpretation of a statute "raise[s] the prospect of unconstitutional applications," a court should adopt the "narrower construction").

***Due Process.*** The Due Process Clause requires that "laws which regulate persons or entities must give fair notice of conduct that is forbidden." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Laws cannot be "vague as applied to" a defendant's conduct. *Butcher v. Knudsen*, 38 F.4th 1163, 1177 (9th Cir. 2022). Here, ROSCA gives *no* notice—fair or otherwise—that additional steps and retention efforts are prohibited. Indeed, the government has already conceded that the "simple mechanisms" standard is so vague that it leaves businesses "*without guidance about*

20

1  *what is simple.*" 88 Fed. Reg. at 24718 (emphasis added). The only way to interpret ROSCA as

2  prohibiting additional steps and retention efforts is to read the law so broadly that it can encompass

3  whatever rule the government currently wants to impose. Of course, such a standardless reading not

4  only ignores the statute's ordinary and objective meaning, but also "invite[s] arbitrary enforcement,

5  [by] giving [courts] unguided discretion to determine when" businesses have violated ROSCA. *See*

6  *Butcher*, 38 F.4th at 1175 (rejecting "entirely subjective" reading). This violates due process.

7      ***First Amendment.*** The government's desire to read ROSCA as prohibiting protected

8  commercial speech compounds this vagueness problem. *See Vill. of Hoffman Ests. v. Flipside,*

9  *Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982) ("law[s] that "interfer[e] with the right of free speech"

10  face an even "more stringent vagueness test"). To restrict Adobe's truthful cancellation-related

11  communications, the First Amendment requires the government to satisfy the *Central Hudson* test.

12  *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980). Under that

13  test, restricting Adobe's commercial speech (1) must "'materially' and 'directly' advanc[e] a

14  substantial government interest" and (2) must be "no more extensive than necessary." *Junior Sports*

15  *Mags. Inc. v. Bonta*, 80 F.4th 1109, 1113 (9th Cir. 2023). Assuming that prohibiting difficult

16  cancellation processes is a substantial government interest, prohibiting speech simply because it

17  seeks to persuade customers does not further that interest. As long as the steps in the cancellation

18  process do not make it deceptive, unusually difficult, or unduly long, then there is no legitimate

19  government interest in prohibiting those steps. "[T]he fear that speech might *persuade* provides no

20  lawful basis for quieting it." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 576 (2011) (emphasis added).

21      The government's reading also fails the "no more extensive than necessary" requirement.

22  *Junior Sports Mags. Inc.*, 80 F.4th at 1113. Nothing in the complaint suggests that the government's

23  interests in simple cancellation "cannot be protected adequately by more limited regulation of

24  [Adobe's] commercial expression," such as prohibiting companies from imposing undue

25  cancellation delays. *Sorrell*, 564 U.S. at 570. Even if the government could permissibly (under

26  *Central Hudson*) restrict some of Adobe's communications, the government's atextual and

27  standardless interpretation of the "simple mechanisms" standard would force Adobe to "steer far

28  wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked."

21

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT; MEMORANDUM OF POINTS & AUTHORITIES
CASE NO. 5:24-CV-3630-BLF

1  *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972). The First Amendment forbids the

2  government from using vague laws to chill protected speech in this way.

3         In sum, because the government's interpretation "raise[s] the prospect of unconstitutional

4  applications" of ROSCA, the Court should adopt Adobe's "narrower construction" of the statute. *See*

5  *Hansen*, 599 U.S. at 781. Indeed, "even if [Adobe's] reading were not the best one"—and it is—

6  Adobe's "interpretation is at least 'fairly possible,' . . . [and] so the canon of constitutional avoidance

7  would still counsel [this Court] to adopt it." *Id.*

8  **IV.    The Court Should Dismiss The Demand For Civil Penalties.**

9         Even if the Court allows the complaint to proceed, the demand for civil penalties should be

10  dismissed. The government can obtain civil penalties only by showing that the defendants violated

11  ROSCA "with actual knowledge or knowledge fairly implied" that its conduct was unlawful. 15

12  U.S.C. § 45(m)(1)(A); *see also Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S.

13  573, 583–84 (2010). The complaint does not plausibly plead such knowledge here.

14        To begin, the government does not allege that Adobe's conduct was intentionally *deceptive*

15  or *fraudulent*. Nor does the government even attempt to overcome Rule 9(b)'s heightened pleading

16  standard applicable to such claims. *See e.g.*, *FTC v. D-Link Sys., Inc.*, No. 3:17-cv-00039-JD, 2017

17  WL 4150873, at *1–2 (N.D. Cal. Sept. 19, 2017). Instead, the government's theory of civil-penalty

18  liability depends on the notion that Adobe must have predicted—and accepted as correct—the

19  implausible and constitutionally problematic theories of ROSCA liability that the government

20  advances in this litigation. But the government cannot cite any rules or guidance that would have

21  provided Adobe with notice of its novel interpretations—*e.g.*, that ROSCA requires one-step

22  cancellation or that an "Annual, paid monthly" plan is not clearly an *annual* plan.

23        The government also ignores the wealth of caselaw and FTC guidance that establish the

24  legitimacy of Adobe's subscription practices. Adobe (which has a legal team, as referenced in the

25  complaint) presumably would have known about those authorities. Adobe would have known that

26  the FTC's pre-ROSCA guidance expressly sanctions the use of hyperlinks to disclose details about

27  early cancellation fees. Adobe would have known that the FTC has *not yet* promulgated a rule

28  requiring one-step cancellation—and that the agency itself has conceded that ROSCA leaves

22

1    regulated parties "without guidance about what is simple." 88 Fed. Reg. at 24,718. Against this legal

2    backdrop, the government's allegations of scienter are implausible *ipse dixit*. Those allegations are

3    even flimsier for the two individual defendants, Maninder Sawhney and David Wadhwani.

4        Nowhere does the complaint plausibly allege that Adobe or its executives actually knew that

5    they were violating the law. The government says that "Adobe is one of the world's largest software

6    companies," it "has extensive legal resources including in-house and outside counsel," and its

7    "management routinely conferred with such in-house counsel . . . regarding legal and regulatory

8    issues relating to Adobe's subscriptions." Compl. ¶ 113. The complaint never says that Adobe's

9    lawyers ever once suggested that the conduct was illegal or that they somehow divined that the

10   government would attempt to impose a not-yet-promulgated rule retroactively. Courts routinely

11   refuse to draw negative inferences of scienter merely because a defendant sought legal advice, and

12   for good reason: conferring with lawyers is responsible corporate practice. *See, e.g.*, *Knorr-Bremse*

13   *Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1344 (Fed. Cir. 2004) (en banc);

14   *In re Tudor Assocs., Ltd., II*, 20 F.3d 115, 119–20 (4th Cir. 1994). Indeed, reliance on counsel can

15   "disprove" a willfulness *mens rea* element. *See United States v. Smith*, 7 Fed. App'x 772, at *1 (9th

16   Cir. 2001) (citing *Bisno v. United States*, 299 F.2d 711, 719 (9th Cir. 1961)).

17       At bottom, the complaint simply alleges the fact of "Adobe's knowledge of ROSCA." *See*

18   Compl. § VI. True enough. But Adobe's knowledge of ROSCA is a far cry from knowledge that its

19   conduct *violated* ROSCA. The complaint's other allegations fare no better. The government claims

20   that Adobe should have known it was violating ROSCA because the FTC issued the company a Civil

21   Investigative Demand (CID). Compl. ¶ 114. Needless to say, a CID is not proof of guilt. Similarly,

22   the government alleges that Adobe was aware of customer complaints regarding the early

23   cancellation fee. *Id.* ¶ 117. But again, "with any business, some customer complaints are expected."

24   *See Am. Future Sys., Inc.*, 2024 WL 1376026, at *21. Customers' annoyance at having to pay a fee

25   that they agreed to pay does not suggest that the disclosures around the fee were unlawful. The

26   demand for civil penalties should be dismissed.

27                               **CONCLUSION**

28       For all these reasons, the Court should dismiss the government's complaint with prejudice.

23

Dated:  October 9, 2024

Respectfully submitted,

SIDLEY AUSTIN LLP

By: _Sheila A.G. Armbrust_

Sheila A.G. Armbrust (SBN 265998)
Lauren C. Freeman (SBN 324572)
Phillip Shaverdian (SBN 328657)
Mark D. Hopson (*pro hac vice*)
Benjamin M. Mundel (*pro hac vice*)
Christina C. Koenig (*pro hac vice*)

*Attorneys for Defendants ADOBE INC.,
MANINDER SAWHNEY and DAVID
WADHWANI*

24