1

2

3

4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7    UNITED STATES,                      Case No. 24-cv-03630-NW

8                    Plaintiff,

                                         **ORDER DENYING MOTION TO**
9          v.                            **DISMISS**

10   ADOBE, INC., et al.,                Re: ECF Nos. 50, 51

11                   Defendants.

12

13         On October 9, 2024, Defendants Adobe, Inc., Maninder Sawhney, and David Wadhwani

14   filed a motion to dismiss.  ECF No. 50.  Having considered the parties' briefs and the relevant

15   legal authority, the Court concludes oral argument is not required, *see* N.D. Cal. Civ. L.R. 7-1(b),

16   VACATES the hearing set for May 7, 2025, and DENIES the motion.

17   **I.    INCORPORATION BY REFERENCE**

18         Defendants request that the Court incorporate by reference Exhibits 1 and 2, attached to the

19   declaration of Benjamin Mundel ("Mundel Decl.").  Request for Judicial Notice at 1, ECF No. 51

20   ("RJN").  Exhibit 1 is a copy of screenshots showing "an example of a complete enrollment flow

21   for a subscription to the Creative Cloud All Apps product under the 'Annual, paid monthly' plan .

22   . . captured in November 2022."  Mundel Decl. ¶ 4.  Exhibit 2 is a copy of screenshots showing

23   "an example of a complete cancellation flow for a subscription to the Creative Cloud All Apps

24   product under the 'Annual, paid monthly' plan . . . captured in September 2022."  *Id.* ¶ 5.[1]

25         When assessing the sufficiency of a complaint under Federal Rule of Civil Procedure

26   12(b)(6), district courts generally cannot consider material outside of the pleadings.  *Khoja v.*

27   _____

28   [1] The Court notes that pages of Exhibits 1 and 2 do not include page numbers.  Thus, the Court
     refers to individual screenshots by the page numbers as they appear in pdf format.

*Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). However, this prohibition does not apply to the judicial notice doctrine under Federal Rule of Evidence 201 or the incorporation by reference doctrine. *Id.*

Unlike judicial notice, incorporation by reference is a "doctrine that treats certain documents as though they are part of the complaint itself." *Id.* at 1002. It "prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Id.* A document "may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Once incorporated by reference, a district court "may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Id.* However, "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Khoja*, 899 F.3d at 1003.

Here, the government's complaint incorporates Exhibits 1 and 2 by reference because the United States explicitly and repeatedly refers to Adobe's enrollment and cancellation mechanisms and includes some screenshots of these online mechanisms. Indeed, the United States refers to these mechanisms in support of its claims that Defendants violated ROSCA and in some instances Exhibits 1 and 2 are duplicative of the selected screenshots in the complaint.

The United States argues that, pursuant to *Khoja*, any inferences drawn from these documents are insufficient to dispute the complaint's allegations. Opp'n at 25. This misconstrues *Khoja*. Indeed, *Khoja* specifically prevents assuming the truth of an incorporated document to "dispute facts stated in a well-pleaded complaint." *Khoja*, 899 F.3d at 1003. Accordingly, the Court incorporates Exhibits 1 and 2 by reference subject to *Khoja*'s restrictions.

## II.    BACKGROUND

### A.    Defendants

Defendant Adobe Inc. ("Adobe") is one of the world's largest software developers and provides popular design and productivity software including Acrobat, Photoshop, and Illustrator. Unredacted Compl. ¶ 1, ECF No. 40 ("Compl."). Since December 2018, Defendant Maninder

1    Sawhney ("Sawhney") has served as Adobe's Senior Vice President of Digital Go To Market &

2    Sales.  *Id.* ¶ 13.  Defendant David Wadhwani ("Wadhwani") is Adobe's President of Digital

3    Media Business and reports directly to the company's CEO.  *Id.* ¶ 16.

**B.**    **Enrollment in Adobe's Software Subscription Plans**

Initially, Adobe offered its software to consumers under a perpetual licensing model,

where the consumer purchased the product and could use it indefinitely.  *Id.* ¶ 23.  Around 2012,

Adobe shifted "to a subscription-based licensing model, where consumers . . . pay for monthly or

yearly access to Adobe's products."  *Id.* ¶ 24.

Adobe's subscription products include a wide variety of "software products and services

for content design, publication, and cloud storage" and are sold on its website, *Adobe.com*.  *Id.* ¶

25.  For its products, Adobe offers three types of subscription plans: (1) a "Monthly" plan, (2) an

"Annual Paid Monthly" ("APM") plan, and (3) an "Annual Prepaid" plan.  *Id.* ¶ 27.  Each plan is

offered at a different price.  *See id.* ¶ 36.  For many products and services, Adobe offers a free trial

subscription.  *Id*. ¶ 33.  At least for the APM plan, "Adobe automatically converts consumers . . .

during a free trial enrollment to paid subscribers if they do not cancel their subscriptions before the

trial period ends."  *Id.*  Consumers also have the option to "start with a 'buy now' APM

subscription, rather than a free trial."  *Id.*

Using a computer or a smart device like a mobile phone or tablet, consumers can subscribe

to Adobe products taking "one of multiple paths to begin the enrollment process, each of which is

also known as an enrollment 'flow.'"  *Id.* ¶ 32.  Since 2019, consumers "have generally followed

substantially the same enrollment flow."  *Id.* ¶ 34.

The enrollment flow begins "with a plan selection page that presents available

subscriptions and their prices."  *Id.* ¶ 36.  A screenshot included in the complaint, titled

"Enrollment Flow Example 1" is shown below.

*(continues on next page)*

United States District Court
Northern District of California

3



Mundel Decl. ¶ 4, Ex. 1, ECF No. 51-2 at p. 3 of 11 (Screenshot of enrollment flow for a subscription under the APM plan captured in November 2022); *see also* Compl. ¶ 36. Most prominently displayed, in bolded large font, is the price. *Id.* ¶ 37. As shown, the APM plan has the lowest price and "Adobe frequently pre-selects the APM plan as a default." *Id.*

The image of Enrollment Flow Example 1 also shows less prominent italicized small text underneath the price of each subscription. *Id.* ¶ 36. Under the price of the APM plan, this text reads, "*Fee applies if you cancel after 14 days*." *Id.* Next to this italicized small text is what is referred to as a "tooltip" icon: ⓘ. *Id.* ¶ 38. When a consumer using a touchscreen device, like a phone or tablet, taps the tooltip icon, a small pop-up text box appears with additional text. *Id.* ¶ 39. Consumers who access the tooltip for the APM plan "reveal a tooltip that reads: 'If you cancel after 14 days, your service will continue until the end of that month's billing period, and you will be charged an early termination fee.'" *Id.* As shown below in the image titled "Enrollment Flow Example 2", the text is smaller than the italicized text underneath the price.

*(continues on next page)*



Mundel Decl. ¶ 4, Ex. 1, ECF No. 51-2 at p. 4 of 11 (Screenshot of enrollment flow for a subscription under the APM plan captured in November 2022); *see also* Compl. ¶ 39.  The tooltip text does not contain any information about the amount of the fee that applies after termination, called an "Early Termination Fee" or "ETF," how the fee is calculated, or the applicable subscription term.  *Id.* ¶ 41.  Neither the text on the underlying page nor the tooltip text explain what constitutes an "early termination."  *Id.* ¶ 43.  Neither discloses that the APM plan requires a one-year commitment.  *Id.* ¶ 42.

Next in the enrollment flow, consumers are directed to additional pages, including one that requires consumers to provide an email address.  *Id.* ¶ 46.  Nothing on those interim pages discloses an annual commitment, an ETF, or the amount of an ETF.  *Id.*

Finally, consumers land on a payment entry page.  *Id.* ¶ 47.  Shown below is Enrollment Flow Example 3.

*(continues on next page)*



Mundel Decl. ¶ 4, Ex. 1, ECF No. 51-2 at p. 6 of 11 (Screenshot of enrollment flow for a subscription under the APM plan captured in November 2022); Compl. ¶ 47. Above the "Agree and subscribe" button (blue icon on the bottom-left portion of the screenshot) on the page is some small font with information about the APM plan's terms. Compl. ¶ 48. The November 2022 screenshot states:

> By clicking "Agree and subscribe", you agree: **After your trial ends, you will be charged US\$54.99[2] (plus tax) monthly. At the end of your one-year term, your subscription will automatically renew monthly until you cancel (price subject to change). Cancel before your trial ends and you won't be charged. No annual commitment required after the first year. Cancel anytime via Adobe Account or** Customer Support. Cancel before Dec 20, 2022[3] to get a full refund and avoid a fee. You also agree to the Terms of Use and the Subscription and Cancellation Terms.

Mundel Decl. ¶ 4, Ex. 1, ECF No. 51-2 at p. 6 of 11 (Screenshot of enrollment flow for a subscription under the APM plan captured in November 2022); Compl. ¶ 48. The words in blue text are hyperlinks that consumers may choose to open. *Id.* ¶ 50. In the final hyperlink in the paragraph titled "Subscription and Cancellation Terms," consumers can find additional terms relating to their chosen subscription in a pop-up window (shown below). *Id.*

---

[2] The subscription changes depending on the plan. Compl. ¶ 48.
[3] The cancel by date changes depending on the date the user signs up. Compl. ¶ 48.

United States District Court
Northern District of California



Mundel Decl. ¶ 4, Ex. 1, ECF No. 51-2 at p. 7 of 11 (Screenshot of enrollment flow for a subscription under the APM plan captured in November 2022).



Mundel Decl. ¶ 4, Ex. 1, ECF No. 51-2 at p. 8 of 11 (Screenshot of enrollment flow for a subscription under the APM plan captured in November 2022).

United States District Court
Northern District of California



Mundel Decl. ¶ 4, Ex. 1, ECF No. 51-2 at p. 9 of 11 (Screenshot of enrollment flow for a subscription under the APM plan captured in November 2022).

After clicking on the "Subscription and Cancellation Terms" hyperlink and scrolling to the bottom of the pop-up window (or through multiple screens of text on a mobile device), a consumer sees "Cancellation Terms" that state:

> You can cancel your subscription anytime via your Adobe Account page or by contacting Customer Support*. If you cancel within 14 days of your initial order, you'll be fully refunded. Should you cancel after 14 days, you'll be charged a lump sum amount of 50% of your remaining contract obligation and your service will continue until the end of that month's billing period.

*Id.* ¶ 51. The asterisk next to "Customer Support" indicates that "[s]pecific countries require cancellations to be made only by contacting Customer Support." Mundel Decl. ¶ 4, Ex. 1, ECF No. 51-2 at p. 9 of 11 (Screenshot of enrollment flow for a subscription under the APM plan captured in November 2022. The text describing "Cancellation Terms" does not include the word "fee" or the phrase "early termination fee," and therefore does not track the language in the previous screens (including the plan selection page, or the tooltip text) that references a fee associated with cancellation. Compl. ¶ 52. This text also does not clarify the length of the subscription term or what is meant by "your remaining contract obligation." *Id.*

The complaint further alleges that the enrollment flows for some users, including those with subscriptions marketed for use in particular business and education contexts, "have at times not displayed a hyperlink to terms and conditions on the payment entry page and instead have enabled consumers to view those terms only *after* Adobe has collected their payment information." *Id.* ¶ 53.

### C.    Cancellation of Adobe's Subscriptions

#### 1.    Cancellation Online

Unless a customer affirmatively cancels their subscription, the customer's subscription plan auto-renews at a charge to the customer.  Compl. ¶ 76.  Subscribers have two options to cancel a subscription: "(1) online self-cancellation; and (2) contacting customer service via online chat or phone."  *Id.* ¶ 77.

To cancel online, a customer first must locate the cancellation page.  *Id.* ¶ 81.  To do so, a customer needs to navigate to their account management page and choose the "Manage Plan" button or hyperlink (located in the bottom left of the screenshot below).  *Id.* ¶ 82.



Mundel Decl. ¶ 5, Ex. 2, ECF No. 51-3 at p. 2 of 10 (Screenshot of cancellation flow for a subscription under the APM plan taken in September 2022).

Clicking on the "Manage Plan" button brings up a pop-screen where users are presented

United States District Court
Northern District of California

with several choices, including to click on a button titled "Cancel your plan" (located in the bottom right of the screenshot below).  Compl. ¶ 82.



Mundel Decl. ¶ 5, Ex. 2, ECF No. 51-3 at p. 3 of 10 (Screenshot of cancellation flow for a subscription under the APM plan taken in September 2022).

      After clicking "Cancel your plan," customers still must go through several additional steps to effectuate the cancellation.  Compl. ¶ 83.  Plaintiff alleges that some customers who attempted to cancel their Adobe plan had to reenter their Adobe password—regardless of whether the subscriber had already signed in before reaching the screen, and some customers were sent to a mandatory feedback page, which asks for reasons for the cancellation (see screenshot below).  *Id.* ¶ 84.

*(continues on next page)*

10



Mundel Decl. ¶ 5, Ex. 2, ECF No. 51-3 at p. 4 of 10 (Screenshot of cancellation flow for a subscription under the APM plan taken in September 2022). As shown in the screenshot below, customers must select an option that "describes your experience" in order to continue.



Mundel Decl. ¶ 5, Ex. 2, ECF No. 51-3 at p. 5 of 10 (Screenshot of cancellation flow for a subscription under the APM plan taken in September 2022).

Following the feedback form, customers must navigate through several webpages, pop-

ups, and offers shown below.  Compl. ¶ 85.  Plaintiff alleges, "at relevant times, consumers had to decline an offer to 'switch products or change some part of your plan'" or "reject various 'save offers' by Adobe, which could include discount offers, offers to switch to other products, and an offer to chat with an Adobe representative and 'check for a custom deal.'"  *Id.*

For instance, as shown below, after selection a reason for cancellation on the feedback form, customers are met with a pop-up screen that asks the consumer whether Adobe can "help you switch products or change some part of your current plan."  *Id.*



Mundel Decl. ¶ 5, Ex. 2, ECF No. 51-3 at p. 6 of 10 (Screenshot of cancellation flow for a subscription under the APM plan taken in September 2022).

Clicking the "No thanks" button in the bottom middle of the pop-up screen then requires customers to review several consequences that follow from the cancellation.  Compl. ¶ 86.

*(continues on next page)*

United States District Court
Northern District of California



Mundel Decl. ¶ 5, Ex. 2, ECF No. 51-3 at p. 7 of 10 (Screenshot of cancellation flow for a subscription under the APM plan taken in September 2022).

Customers that click "Continue" (the blue button on the lower right of the screenshot above) next encounter a screen with a save offer. Compl. ¶ 85.



Mundel Decl. ¶ 5, Ex. 2, ECF No. 51-3 at p. 8 of 10 (Screenshot of cancellation flow for a subscription under the APM plan taken in September 2022).

United States District Court
Northern District of California

Moving past this screen requires customers to click "Continue" (the blue button on the lower right of the screenshot above), which leads the customer to yet another screen that outlines the consequences that follow from the cancellation.  Compl. ¶ 86.



Mundel Decl. ¶ 5, Ex. 2, ECF No. 51-3 at p. 9 of 10 (Screenshot of cancellation flow for a subscription under the APM plan taken in September 2022).

After clicking "Confirm" (the red button in the lower right corner of the above screenshot), customers see a final screen advertising Adobe's products and letting the customer know they are "still part of the Adobe community."

*(continues on next page)*



Mundel Decl. ¶ 5, Ex. 2, ECF No. 51-3 at p. 10 of 10 (Screenshot of cancellation flow for a subscription under the APM plan taken in September 2022).

The complaint alleges that "at relevant times, Adobe placed in prominent red font the ETF amount that APM plan subscribers would be charged if they cancelled their subscription." Compl. ¶ 86. "Many subscribers learn for the first time about the ETF—and its amount—during cancellation." *Id.* ¶ 87. The Court notes that neither party provided the Court with a screenshot of the page that provides the ETF amount a customer would pay, if applicable.

### 2. Cancellation by Phone or Online Chat

Subscribers can also cancel their plans by "contacting Adobe's customer service via phone or online chat." *Id.* ¶ 89. The complaint alleges that "[s]ubscribers who have attempted to cancel via customer service have encountered several obstacles that impede or delay their attempts to cancel" and lists several examples. *Id.* ¶ 90. For example, when seeking to cancel their subscriptions via chat, "if a subscriber is inactive in an online customer service chat for just three minutes, the chat automatically ends, forcing the subscriber to restart the process." *Id.* Additionally, customers seeking to cancel by phone or chat "have been transferred to one or more Adobe representatives during their call or chat, forcing them to encounter delays, re-explain themselves, and request cancellation multiple times." *Id.* Further, "Adobe's standard operating

procedure during relevant times has been to transfer calls from APM plan subscribers seeking to cancel to Adobe's retention personnel, who are trained to retain customers attempting to cancel their subscriptions and 'save' them from canceling."  Compl. ¶ 92.

Plaintiff alleges customers seeking to cancel their subscriptions by phone or chat encounter similar things to those experienced by customers trying to cancel online.  *Id.* ¶ 93.  For instance, Adobe typically asks customers "to provide a reason for cancelling before proceeding with their request."  *Id.* ¶ 94.  Customers seeking to cancel by phone or chat are usually asked "additional follow-up questions" presented with 'save offers,' discounts, or free trials.  *Id.* ¶¶ 95, 97. Customers seeking to cancel are warned by Adobe of the EFT.  *Id.* ¶ 97.  All in all, "subscribers attempting to cancel via phone or chat have been subjected to a time-consuming and burdensome process."  *Id.* ¶ 96.

### D.    Defendants' Knowledge and Involvement

Subscribers of the APM plan have frequently complained about these issues to the Better Business Bureau, state law enforcement agencies, on social media, on Adobe community support pages, and to Adobe.  Compl. ¶ 54.  In their complaints, customers report confusion over the one-year plan term and the imposition of a sizable EFT.  *Id.* ¶ 55.  Such complaints have been the "top drivers of customer support contacts, dissatisfied customers, and customer inquiry escalations at Adobe."  *Id.*

Plaintiff contends all Defendants are aware of these complaints.  *Id.* ¶ 56.  Indeed, Defendants faced pressure to change their company practices.  *Id.* ¶ 57.  For example, a May 2022 report "found most consumers had difficulty trying to determine how much they would be forced to pay if they cancelled a subscription."  *Id.*  Adobe's own employees and executives expressed concern about consumer confusion and harm from the company's practices.  *Id.*

Since at least 2019, Defendant Sawhney "has played a central role in implementing and directing Adobe's ETF and APM enrollment flow practices."  *Id.* ¶ 59.  His team oversees and manages Adobe's EFT policies and has "closely tracked consumer complaints about the ETF, analyzed and proposed changes to ETF policies, conducted analysis of the ETF's revenue implications (including analysis of the revenue Adobe would lose if it more clearly disclosed or

1  eliminated the ETF), and briefed and advised Adobe leadership about ETF issues and business

2  strategy." *Id.* ¶¶ 60-61.  "Sawhney has made critical decisions steering Adobe's ETF approach."

3  *Id.* ¶ 62.  Sawhney discussed the May 2022 report with other Adobe executives and prepared

4  internal materials that reference regulatory concerns over Adobe's practices.  *Id.* ¶ 67.

5  Defendant Wadhwani supervised Sawhney.  Compl. ¶¶ 72-73.  As Adobe's President of

6  Digital Media Business, he "helps guide Adobe's overall business strategy regarding online

7  subscriptions, including the APM plan."  *Id.* ¶ 68.  Sawhney's team provided Wadhwani "detailed

8  briefings . . . regarding ETF policies, consumer complaints, and business strategy."  *Id.* ¶ 73.

9  Wadhwani too has discussed customer complaints regarding the APM plan with other executives

10  and "contributed to and directed ETF policies."  *Id.* ¶¶ 74-75.

11  Adobe and its executives were aware of government and regulatory scrutiny into Adobe's

12  subscription enrollment and cancellation practices.  Compl. ¶ 114.  In June 2022, the FTC issued a

13  Civil Investigative Demand to Adobe, "probing potential violations of ROSCA related to Adobe's

14  APM plan disclosures and cancellation mechanisms."  *Id.*  This came after the May 2022 report

15  that "specifically referenced ROSCA and explained how Adobe's practices—including

16  insufficient disclosures and deceptive enrollment flow features that hid critical information—

17  appeared to violate ROSCA."  *Id.* ¶ 115.

18  ### E.    Procedural Posture

19  Plaintiff United States of America, acting upon notification and referral from the FTC,

20  initiated this lawsuit on June 17, 2024.  ECF No. 1.  The operative unredacted complaint was filed

21  on July 23, 2024.  Unredacted Compl., ECF No. 40.  On October 9, 2024, Defendants filed the

22  instant motion to dismiss.  Mot.

23  ## III.    LEGAL STANDARD

24  Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint

25  if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to

26  dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its

27  face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This standard requires the plaintiff

28  to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully."

1   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While courts do not require "heightened fact

2   pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the

3   speculative level."  *Twombly*, 550 U.S. at 555, 570.

4          In deciding whether the plaintiff has stated a claim upon which relief can be granted, the

5   court must assume that the plaintiff's allegations are true and must draw all reasonable inferences

6   in the plaintiff's favor.  *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).

7   However, the court is not required to accept as true "allegations that are merely conclusory,

8   unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536

9   F.3d 1049, 1055 (9th Cir. 2008).

10  **IV.    DISCUSSION**

11         Enacted in 2010, the Restore Online Shoppers' Confidence Act ("ROSCA" or "the Act")

12  recognizes the Internet as "an important channel of commerce" and emphasizes the need to

13  "provide consumers with clear, accurate information" online.  15 U.S.C. § 8401(1)-(2).  In

14  addition, ROSCA aims to combat "the aggressive sales tactics many companies use against their

15  online customers."  § 8401(3).  In particular, the Act seeks to curb the "misleading sales tactics to

16  charge millions of American consumers for membership clubs the consumers did not want."

17  § 8401(4).

18         Unless certain requirements are met, ROSCA makes it unlawful "to charge or attempt to

19  charge any consumer for any goods or services sold in a transaction effected on the Internet

20  through a negative option feature."  § 8403.  ROSCA incorporates the Federal Trade

21  Commission's Telemarking Sales Rule's definition of a negative option feature.  *Id.*  A negative

22  option feature is "an offer or agreement to sell or provide any goods or services" where a

23  "customer's silence or failure to take an affirmative action to reject goods or services or to cancel

24  the agreement is interpreted by the seller as acceptance of the offer."  16 C.F.R. § 310.2(w).

25  Negative option features can be offered if the website:

26             **(1)** provides text that clearly and conspicuously discloses all material
               terms of the transaction before obtaining the consumer's billing
27             information;

28

United States District Court
Northern District of California

18

**(2)** obtains a consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for products or services through such transaction; and

**(3)** provides simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account.

§ 8403.

### A.    Negative Option Feature (All Claims – Counts I, II, and III)

As a threshold matter, the Court finds the complaint sufficiently alleges that Adobe's subscriptions, including its APM plan, are negative option features. Subscriptions that automatically renew by default unless the consumer affirmatively cancels are "textbook example[s] of a negative option feature." *United States v. MyLife.com, Inc.*, 499 F. Supp. 3d 757, 762 (C.D. Cal. 2020); *see also Fed. Trade Comm'n v. Health Formulas, LLC,* No. 2:14-CV-01649-RFB, 2015 WL 2130504 (D. Nev. May 6, 2015) (finding recurring payment plans, where customers were automatically enrolled and charged if they did nothing, constituted negative option features). Tellingly, the Act itself requires simple mechanisms to stop "recurring charges"— "a clear reference to a subscription or program that renews automatically." § 8403(3); *MyLife.com, Inc.*, 499 F. Supp. 3d at 762.

Here, the complaint alleges that Adobe's subscriptions automatically renew absent affirmative action by a customer. For example, the United States notes, "Adobe auto-renews its customers' subscription plans and continues to charge customers until they affirmatively act to cancel their subscriptions." Compl. ¶ 76. In addition, the complaint describes how Adobe shifted to a subscription model around 2012, "where consumers must pay for monthly or yearly access to Adobe's products, and where their subscription renews automatically." *Id*. ¶ 24. Such recurring charges, effected through silence, constitute negative option features.

Adobe does not acknowledge these allegations but rather argues that a "customer's affirmative consent to purchase the 'Annual, paid monthly' subscription is not based on silence-it is affirmatively given." Mot. at 9. This argument misses the mark. The relevant time for consumer action is not at the time of purchase but at the time of renewal, which under the APM is at the end of the year. Indeed, Adobe's subscription terms for this plan state "At the end of your

one-year term, your subscription will automatically renew monthly until you cancel (price subject to change)."  Compl. ¶ 48.

Another type of negative option feature is a "free-to-pay conversion or fee-to-pay conversion" plan, where consumers receive goods or services for free (or at a nominal fee) for a trial period until sellers begin charging a fee unless the consumer affirmatively cancels.  16 C.F.R. § 425.2; *see also* Rule Concerning the Use of Prenotification Negative Option Plans, 79 Fed. Reg. 44271-01 (July 31, 204) (describing the related concept of "trial conversions").  The government argues that Adobe's subscriptions are conversion plans and thus negative option features.  Opp'n at 7.  Adobe counters that "many customers purchase Adobe subscriptions through the 'buy now' option," where there is no free trial component.  Mot. at 9.

The Court agrees with the government and finds that Adobe offers subscriptions, including the APM plan, as free-to-pay conversion plans thus making them negative option features. Indeed, the complaint alleges, "Adobe automatically converts consumers who select the APM plan during a free trial enrollment to paid subscribers if they do not cancel their subscriptions before the trial period ends."  Compl. ¶ 33.  This is sufficient.

The Court finds the complaint adequately pleads allegations indicating Adobe's subscriptions are negative option features covered under ROSCA.

**B.    Clear and Conspicuous Disclosure of Material Terms (Count I)**

Having found that the complaint sufficiently alleges that Adobe's "Annual, paid monthly" plan is a negative option feature, the Court must determine whether the government has alleged that Adobe does not "clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information."  § 8403(1).  "ROSCA does not define 'clearly and conspicuously' and only a few federal district courts have examined what clear and conspicuous means under ROSCA."  *Fed. Trade Comm'n v. Amazon.com, Inc.*, 735 F. Supp. 3d 1297, 1314 (W.D. Wash. 2024).  However, the parties appear to agree that a "reasonable consumer standard" applies.  *See* Reply at 3, ECF No. 71.  Derived from state contract formation cases, the reasonable consumer standard in sum finds that a "material representation is deceptive if it 'is likely to mislead consumers acting reasonably under the circumstances.'"  *Amazon.com, Inc.,* 735

F. Supp. 3d at 1315 (citation omitted). "Because what a reasonable person would believe is generally a question of fact, it is a 'rare situation' in which a motion to dismiss will be granted for failure to satisfy this test." *Dinan v. Sandisk LLC*, No. 18-CV-05420-BLF, 2019 WL 2327923, at *4 (N.D. Cal. May 31, 2019).

"[T]he analysis of the disclosure is necessarily contextual, meaning that the Court must consider the text, whatever size it is, in relation to the other elements on the page." *Amazon.com, Inc.*, 735 F. Supp. 3d at 1316 (quoting *Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*, 325 F. Supp. 3d 852, 863 (N.D. Ill. 2018)). "[C]ourts have routinely noted that that a disclosure in small type is unlikely to be clear or conspicuous when accompanied by type that is larger, bolded, or italicized." *Credit Bureau Ctr., LLC*, 325 F. Supp. 3d at 863.

Helpful here is a recently finalized series of regulations relating to subscription plans and negative option features, titled "Rule Concerning Recurring Subscriptions and Other Negative Option Programs." 16 C.F.R. ¶¶ 425.1-425.9. The rule states "Clear and Conspicuous means that a required disclosure is easily noticeable (i.e., difficult to miss) and easily understandable by ordinary consumers." 16 C.F.R. § 425.2. The rule then lists several examples of clear and conspicuous disclosures:

> (1) In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented . . .
>
> (2) A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.
> . . .
> (4) In any communication using an Interactive Electronic Medium, such as the internet, mobile application, or software, the disclosure must be unavoidable.
>
> (5) The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.
>
> (6) The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

1           (7) The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

2 *Id.*

3         Adobe makes three arguments in support of its overall conclusion that the government

4 failed to state a claim under Count I: Adobe clearly and conspicuously disclosed (1) that its APM

5 plan was an annual plan, (2) the ETF, and (3) the cancellation fee methodology.  Mot. at 10-15.

6         As to the plan term or duration, the Court finds that Adobe clearly and conspicuously

7 disclosed that its APM plan is an annual or yearly plan.  A reasonable consumer would not be

8 misled by this disclosure.

9         Here, the context matters.  Adobe offers three types of subscription plans, all with different

10 titles displayed in its enrollment flow on the plan selection page: (1) a "Monthly" plan, (2) an

11 "Annual Paid Monthly" ("APM") plan, and (3) an "Annual Prepaid" plan.  Compl. ¶ 27.  While

12 the price of each plan is displayed in large, bolded font, the title appears first in the box for each

13 plan.  *Id.* ¶¶ 36-37.  Additionally, all three plans appear together, allowing the consumer to

14 compare each.  *Id.* ¶ 36.



27 *Id.*  The plan name is unavoidable and uses diction and syntax understandable to ordinary

28 consumers: "Annual, paid monthly."  *Id.*  Thus, here, the Court finds that no reasonable consumer

United States District Court
Northern District of California

would believe based on the title and context of the plan that its term was more or less than one year.

However, the Court finds that the complaint plausibly alleges that Adobe did not clearly and conspicuously disclose (2) the ETF, and (3) the cancellation fee methodology for it, two material terms of the APM subscription.

First, the complaint sufficiently alleges that a reasonable consumer would be misled by Adobe's disclosure of the ETF, including what it is, when it applies, how much it is, and how that amount is calculated. While the fact that a fee applies is disclosed, it is not easily noticeable or easily understandable to consumers. On the plan selection page, the text regarding a fee appears in small, italicized text underneath the bolded, large font disclosing the price of the subscription. Compl. ¶ 36. Further, the text reads, "*Fee applies if you cancel after 14 days*" and does not reference an "early termination fee." *Id.* ¶ 38. It is only if consumers hover or click on the tooltip icon (which many consumers do not do) that an "early termination fee" is referenced. *Id.* ¶¶ 39, 45. This is easy to miss. Moreover, neither of these disclosures define the ETF amount or when precisely it applies. *Id.* ¶¶ 38-39.

Second, the complaint plausibly alleges that Adobe does not clearly and conspicuously disclose the calculation method of the ETF. Indeed, the calculation method of the EFT associated with the APM plan is buried "at the bottom of an optional, hyperlinked[4] terms page that consumers are unlikely to see." Opp'n at 11 (citing Compl. ¶¶ 50-52). As alleged, the hyperlink containing the ETF calculation method appears on the last page of the enrollment flow, in small font below the payment information and the "Agree and Subscribe" button. Compl. ¶ 48. Consumers can choose to open the hyperlink, or not. *Id.* ¶ 50. Only after clicking on the "Subscription and Cancellation Terms" hyperlink and scrolling to the bottom of the pop-up window (or through multiple screens of text on a mobile device), can a consumer see cancellation terms that state: "Should you cancel after 14 days, you'll be charged a lump sum amount of 50%

---

[4] The parties cite a bevy of authorities as to whether hyperlinks are clear and conspicuous disclosures. *See* Mot. at 14, Opp'n at 11-12, and Reply at 7-8. The Court is not required to analyze the various authorities at this juncture; it is enough that Plaintiff has sufficiently pleaded that Adobe's hyperlinks were not clear and conspicuous.

United States District Court
Northern District of California

of your remaining contract obligation and your service will continue until the end of that month's billing period." *Id.* ¶ 51.  This doesn't match earlier references to a fee or cancellation in the plan selection page or tooltip text.  *Id.* ¶ 52.  It also does not clarify the length of the subscription term or what is meant by "your remaining contract obligation."  *Id.*  This is not easily noticeable or easily understandable by ordinary consumers.

The Court finds that Plaintiff failed to state a claim that Adobe did not clearly and conspicuously disclose the APM plan's one-year term.  However, because the Court finds that the Plaintiff did state a claim that Adobe did not clearly and conspicuously disclose the ETF or its calculation method, the Court DENIES Adobe's motion to dismiss Count I of the complaint.

### C.    Consumer Express Informed Consent (Count II)

ROSCA requires "a consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for products or services" with a negative option feature.  § 8403(2).  "[C]ourts have found that when the material terms are not clearly and conspicuously disclosed, 'these inadequate disclosures constitute evidence that Defendants often do not obtain consumers' express informed consent before charging their cards or accounts.'"  *Amazon.com, Inc.*, 735 F. Supp. 3d at 1321 (quoting *Health Formulas, LLC,* 2015 WL 2130504, at *16.

Adobe argues that "because the complaint does *not* plausibly allege a violation of ROSCA's clear and conspicuous requirement, Count II fails alongside Count I."  Mot. at 16. Because the Court finds the complaint does plausibly allege a violation of ROSCA's clear and conspicuous requirement, Adobe's motion to dismiss this claim is DENIED.

### D.    Simple Cancellation Mechanism (Count III)

ROSCA requires companies selling goods or services through negative option features to "provide[ ] simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account."  § 8403(3).  The statute does not define "simple mechanisms."  *Amazon.com, Inc.*, 735 F. Supp. 3d at 1322.

A Central District of California court, in granting injunctive and other relief ordered that a simple "mechanism must not be difficult, costly, confusing, or time consuming, and must be at

24

least as simple as the mechanism the consumer used to initiate the Charge(s)." *Fed. Trade Comm'n v. Cardiff*, No. ED518CV02104SJOPLAX, 2019 WL 9143561, at *10 (C.D. Cal. May 16, 2019). Similarly, the District of Nevada found a Defendant had not provided a simple mechanism for cancellation because the mechanism was "not stated on Defendants' product order pages or in confirmation emails giving the details of each online transaction." *Health Formulas, LLC*, 2015 WL 2130504, at *16. More recently, the Western District of Washington found Amazon's cancellation method was not simple because the "process required consumers to click six times and go through four screens, seeking to entice consumers not to cancel the subscription, or merely pause the subscription, before the consumer could finally cancel Prime." *Amazon.com, Inc.*, 735 F. Supp. 3d at 1323.

The United States alleges that Adobe's online cancellation process is far from simple. Compl. ¶ 78. Indeed, to cancel, customers need to find the cancellation page by navigating to their account management page. *Id.* ¶¶ 81-82. Then they need to choose the "Manage Plan" button. *Id.* Then the customer sees a pop-up screen with several options, one of which is to "Cancel your plan." *Id.* ¶ 82. After clicking the "Cancel your plan" button, customers see a mandatory feedback page, which prompts the customer to explain the cancellation. *Id.* ¶ 84. After clicking a box to provide feedback, customers must decline an offer to "switch products or change some part of your plan." *Id.* ¶ 85. Then customers view a screen that describes what cancelling their plan means and must click again to move on in the process. Compl. ¶ 86. Customers are again offered a 'save offer' that they must click past. *Id.* ¶ 85; *see also* Mundel Decl. ¶ 5, Ex. 2, ECF No. 51-3 at p. 8 of 10 (Screenshot of cancellation flow for a subscription under the APM plan taken in September 2022). Finally, customers reach a screen reading "What to expect when you cancel" with a red "Confirm" button to click. Mundel Decl. ¶ 5, Ex. 2, ECF No. 51-3 at p. 9 of 10 (Screenshot of cancellation flow for a subscription under the APM plan taken in September 2022). By the Court's count, the process requires eight clicks, including selecting a box for feedback, and eight screens, many of which entice the customer not to cancel their subscription, before the customer can finally cancel their Adobe subscription. Not only is this process difficult, confusing,

1  and time consuming, but it is not nearly "as simple as the mechanism the consumer used to initiate

2  the" subscription.  *Cardiff*, 2019 WL 9143561, at *10.

3          The United States also alleges that Adobe's online chat and phone cancellation process is

4  far from simple.  Compl. ¶ 78.  Customers seeking to cancel by chat experience automatic

5  termination of the process if idle for more than three minutes.  *Id.* ¶ 90.  By chat or by phone

6  customers wishing to cancel are transferred to multiple Adobe representatives leading to delays,

7  re-explanations, and repetitive cancellation requests.  *Id.*  Customers are transferred to trained

8  retention personal who work to prevent them cancelling.  *Id.* ¶ 92.  In short, customers attempting

9  to cancel their Adobe subscriptions by phone and chat are "subjected to a time-consuming and

10  burdensome process."  *Id.* ¶ 96.  The process is difficult and confusing.  *Cardiff*, 2019 WL

11  9143561, at *10.

12          Adobe asserts that dropped calls or chats cannot necessarily be attributed to it and that

13  some number of customer complaints are to be expected for a company that serves tens of millions

14  of customers.  *Id.*  These arguments are unavailing and do not address whether the phone and chat

15  cancelation mechanisms are simple, as opposed to difficult, confusing, and time consuming.

16  *Cardiff*, 2019 WL 9143561, at *10.

17          Adobe argues that its two methods for cancelling its subscriptions—by phone or online—

18  do not run afoul of ROSCA.[5]  Mot. at 17-20; Reply at 9-13.  As to its online cancellation process,

19  Adobe asserts that multiple steps are allowed, as are retention efforts.  Mot. at 18.  Similarly,

20  Adobe argues that its phone and chat cancellation processes are permitted under ROSCA.  Mot.

21  19-20.  While this may be true in the abstract (the Court takes no position), permissible in the

22  abstract does not necessarily equate with permissible as applied.  In this instance, the government

23  sufficiently alleged in the complaint that Adobe's cancellation mechanisms violate ROSCA.

24          Viewing the complaint in the light most favorable to the United States, the Court does not

25

26  ─────────────────

27  [5] Adobe also argues that the government interprets ROSCA as requiring a one-step cancellation
   method or a prohibition on retention efforts and such an interpretation violates the Constitution.
   Mot. at 20-22.  This misinterprets the government's allegations, arguments, and ROSCA claims.

28  Opp'n at 18-20.  Because the Court does not read the complaint in this way or interpret ROSCA in
   this manner in its ruling, it need not decide whether such an interpretation is proper.

United States District Court
Northern District of California

dismiss the claim under Count III that Adobe's cancellation method was not a "simple mechanism."

### E.    Demand for Civil Penalties

The FTC Act authorizes the FTC to "commence a civil action to recover a civil penalty in a district court of the United States against any person, partnership, or corporation which violates any rule under this subchapter respecting unfair or deceptive acts or practices . . . with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule." 15 U.S.C. § 45(m)(1)(A).  ROSCA subjects violators to the same penalties.  15 U.S.C. § 8404(b) ("Any person who violates [ROSCA] . . . shall be subject to the penalties and entitled to the privileges and immunities provided in the Federal Trade Commission Act as though all applicable terms and provisions of the Federal Trade Commission Act were incorporated in and made part of this chapter.").

"Whether a defendant has violated a rule with actual or implied knowledge is based on objective factors.  A defendant is responsible where a reasonable person under the circumstances would have known of the existence of the provision and that the action charged violated that provision." *Amazon.com, Inc.*, 735 F. Supp. 3d at 1332 (quoting *United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 139 (4th Cir. 1996)).  Additionally, circumstantial evidence as to an individual's "degree of participation in business affairs is probative of knowledge." *Id.* (citations and quotations omitted).

Adobe argues that the government fails to allege that its conduct was "intentionally deceptive or fraudulent" such that the complaint overcomes Rule 9(b)'s heightened pleading standard.  Mot. at 22 (citing *Fed. Trade Comm'n v. D-Link Sys., Inc.*, No. 3:17-CV-00039-JD, 2017 WL 4150873, at *1-2 (N.D. Cal. Sept. 19, 2017)) (emphasis omitted).  The government responds stating that "[n]umerous courts have held that FTC Act claims are governed by Rule 8(a)'s general notice pleading standard, not Rule 9(b)'s heightened standards for allegations of fraud."  Opp'n at 66 (citing cases).

Whether Rule 9(b) applies to ROSCA claims is an unsettled question. *Amazon.com, Inc.*, 735 F. Supp. 3d at 1324.  "In some cases, district courts in the Ninth Circuit have found that Rule

United States District Court
Northern District of California

9(b) applies to violations of Section 5 of the FTC Act where the FTC alleged that the defendant violated the Act by deceiving consumers with misleading or false statements." *Id.* (citing cases). For example, in *Fed. Trade Comm'n v. D-Link Sys., Inc.*, cited by Adobe, a Northern District of California court found that Rule 9(b) applied to the FTC's deception claims, but declined to determine whether the Rule applied to the FTC's unfairness claim. 2017 WL 4150873, at *1-2. In *Amazon.com,* the court noted that the FTC allegations that Amazon included "'*manipulative* design elements that *trick* users into making decisions they would not otherwise have made' . . . may very well sound in fraud" but declined to rule on the issue because it found the complaint met the heightened pleading standard. 735 F. Supp. 3d at 1324 (quotations and citations omitted) (emphasis in original).

Adobe does not directly argue that Rule 9(b) should apply in ROSCA cases. *See* Mot. Instead, Adobe argues without support that Rule 9(b) applies. Mot. at 22. In so doing, Adobe improperly relies on a single district court case where the court found Rule 9(b) applied to some FTC Act claims (but not specifically ROSCA claims) but declined to decide the issue on others. *Id.* This is insufficient to raise the issue of whether Rule 9(b) applies to ROSCA claims and thus the Court declines to decide the issue.

Additionally, Adobe argues that the complaint does not "plausibly allege that Adobe or its executives actually knew that they were violating the law." Mot. at 23. Yet at the pleadings stage, actual knowledge is not required. *Amazon.com, Inc.*, 735 F. Supp. 3d at 1333. The government can withstand a motion to dismiss by alleging "constructive knowledge—that a 'reasonable person under the circumstances would have known of the existence of the provision.'" *Id.* (citing *Nat'l Fin. Servs., Inc.*, 98 F.3d at 139).

Here, viewing the complaint in the light most favorable to the government, the allegations sufficiently indicate that Defendants had constructive knowledge that its practices violated ROSCA. Customers frequently complained about Adobe's enrollment flow, its imposition of an EFT, and difficulties with cancellation. Compl. ¶¶ 54-56, 106, 109. Defendants were aware of these complaints. *Id.* ¶ 56. Adobe's own employees and executives expressed concern. *Id.* ¶ 57. An outside report in May 2022 noted that "consumers had difficulty trying to determine how much

they would be forced to pay if they cancelled a subscription," *id.*, and "specifically referenced ROSCA and explained how Adobe's practices—including insufficient disclosures and deceptive enrollment flow features that hid critical information—appeared to violate ROSCA." *Id.*  A June 2022 FTC Civil Investigative Demand to Adobe, probed "potential violations of ROSCA related to Adobe's APM plan disclosures and cancellation mechanisms." *Id.* ¶ 114.  Indeed, a reasonable person under the circumstances would have known not only of the existence of ROSCA but of Adobe's lack of compliance with it.

Similarly, the complaint sufficiently alleges that Defendants Sawhney and Wadhwani had actual or constructive knowledge of the requirements of ROSCA, and that Adobe's practices ran afoul of it.  Both had a high degree of participation in Adobe's EFT and APM plan practices and helped guide business strategy.  Compl. ¶¶ 59-61, 68, 74-75.  They were aware of customer complaints and discussed them with other executives at Adobe.  *Id.* ¶¶ 56, 60-61, 68, 73-75.  They made critical decisions and contributed to ETF policies.  *Id.* ¶¶ 62, 74-75.  As executives, they "were aware of government and regulatory scrutiny into its subscription enrollment and cancellation practices." *Id.* ¶ 114.  Objectively, in light of the complaint's allegations, a reasonable person in Sawhney and Wadhwani's positions would have known of the existence of ROSCA and its violation.

## V.    CONCLUSION

The Court DENIES Defendants' motion to dismiss as to all counts.  Defendants shall file an answer to the operative complaint in two weeks, on May 16, 2025.

The Court will hold an initial case management conference on Tuesday, June 24, 2025, at 9:00 a.m. via Zoom video.  A joint case management conference statement is due two weeks prior on Tuesday, June 10, 2025.

**IT IS SO ORDERED.**

Dated: May 2, 2025

Noël Wise
United States District Judge